**CROUSE–HINDS COMPANY, Plaintiff–Counterclaim–Defendant–Appellant,**

v.

**INTERNORTH, INC., and IN Holdings, Inc., Defendants–Counterclaim–Plaintiffs–Appellees.**

No. 538, Docket 80–7865.

United States Court of Appeals, Second Circuit.

Argued Oct. 30, 1980.

Decided Nov. 14, 1980.

Edwin E. McAmis, New York City (Skadden, Arps, Slate, Meagher & Flom, New York City, Bond, Schoeneck & King, Syracuse, N. Y., of counsel), for plaintiff–counterclaim–defendant–appellant.

John L. Warden, New York City (Robert J. Katz, D. Stuart Meiklejohn, William L. Farris, Sullivan & Cromwell, New York City, Donald J. Kemple, Hancock, Estabrook, Ryan, Shove & Hurst, Syracuse, N. Y., of counsel), for defendants–counterclaim–plaintiffs–appellees.

Before MOORE and KEARSE, Circuit Judges, and TENNEY,* District Judge.

KEARSE, Circuit Judge:

 This is an expedited appeal by Plaintiff–Counterclaim–Defendant Crouse–Hinds Company ("Crouse–Hinds") from an order of the United States District Court for the Northern District of New York, Howard G. Munson, Chief Judge, which, *inter alia*, granted the motion of Defendants–Counterclaim–Plaintiffs InterNorth, Inc. and IN Holdings, Inc. (collectively "InterNorth"), for a preliminary injunction preventing Crouse–Hinds from performing an agreement with the Belden Corporation ("Belden") pursuant to which Crouse–Hinds was to offer to purchase a portion of Belden's outstanding stock in exchange for stock of Crouse–Hinds. We find that in assessing the likely merits of InterNorth's counterclaim the district court improperly allocated the burden of proof. Accordingly, we reverse so much of the order as granted the preliminary injunction.[1]

## I

Plaintiff Crouse–Hinds is a New York corporation with headquarters in Syracuse, New York. It is the largest United States manufacturer of high quality electrical products designed for heavy–duty use. Defendant–Counterclaimant InterNorth is a Delaware corporation with its principal office in Omaha, Nebraska. It is engaged in the exploration for and the production, transmission and sale of natural gas and other energy products.

Belden is a Delaware corporation with its executive offices in Geneva, Illinois. It is engaged in the production and sale of wires, cables and cords, and the distribution of electrical equipment. It is not a party to this lawsuit.

This appeal is part of a fast–moving series of events relating to the announcement on September 9, 1980, of a proposed merger between Crouse–Hinds and Belden; the announcement by InterNorth on September 12, 1980, of a tender offer for a majority of the stock of Crouse–Hinds ("Tender Offer"); and the announcement by Crouse–Hinds and Belden on September 23, 1980, of a modification of the merger agreement, pursuant to which Crouse–Hinds offered to acquire a portion of Belden's outstanding stock in exchange for Crouse–Hinds stock ("Exchange Offer"). InterNorth contends that the Exchange Offer violates various provisions of state law. The major events do not appear to be in dispute.

A. *The Proposed Merger Between Crouse–Hinds and Belden*

During the summer of 1980, Crouse–Hinds and Belden entered into negotiations for a merger.[2] As a result of the negotiations, on September 8, 1980, the boards of directors of Crouse–Hinds and Belden approved an agreement by which Belden would be merged into a Crouse–Hinds subsidiary; the exchange ratio was to be 1.24 shares of Crouse–Hinds stock for each share of Belden stock. The merger required the approval of a majority of the shareholders of Crouse–Hinds, N.Y.Bus.Corp.Law §§ 801, 803 (McKinney's Supp.1979), and a majority of the stockholders of Belden, 8 Del.Code Ann. §§ 251, 252. *See* New York Stock

---

* The Honorable Charles H. Tenney, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

1. Judge Munson's order also denied a motion by Crouse–Hinds to dismiss the InterNorth counterclaims, and Crouse–Hinds purports to appeal from that portion of the order as well. The denial of a motion to dismiss is not normally appealable, *Catlin v. United States*, 324 U.S. 229, 236, 65 S.Ct. 631, 635, 89 L.Ed. 911 (1945); *E.E.O.C. v. American Express Co.*, 558 F.2d 102, 103 (2d Cir. 1977), and we decline to exer-

cise pendent appellate jurisdiction over that part of the order.

2. During the spring of 1980 Belden had been invited to enter into merger negotiations by Ampco–Pittsburgh Corporation. Belden declined, and shortly commenced serious negotiations with Crouse–Hinds. Chris J. Witting, Crouse–Hinds's Chairman and Chief Executive Officer, had been a Belden director for seven years, and similar but "less serious" discussions had taken place between the companies in the past.

Exchange Company Manual, A 283–84. Stockholder meetings to vote on the merger were to be scheduled at a future date and the agreement required both boards to recommend to their respective stockholders "that they consider and approve" the merger. The merger agreement was announced to the public on September 9.

InterNorth does not assert any challenge to the bona fides of the negotiations that led to the proposed merger. Nor would it have standing to mount such a challenge; it did not become a shareholder of Crouse–Hinds until September 11, 1980.[3]

### B. The Tender Offer by InterNorth

Unknown to Crouse–Hinds and Belden, InterNorth, for more than a year prior to September 9, had been conducting studies of candidates for possible acquisition. According to the deposition testimony of an InterNorth official, during the week of September 2, InterNorth's Management Committee had decided to recommend the acquisition of Crouse–Hinds to the board of directors for consideration at its September 9 meeting.

Notwithstanding the announcement on September 9 by Crouse–Hinds and Belden of their proposed merger, the InterNorth board decided to accept the recommendation of the Management Committee and to commence a tender offer for Crouse–Hinds stock. Belden, however, had not been the object of any previous InterNorth acquisition study, and InterNorth was not interested in acquiring Belden. (After learning of the intended merger, InterNorth consulted Standard & Poor's and Moody's to ascertain Belden's line of business, but made no further investigation.) Thus, InterNorth decided to make its tender offer conditional on the abandonment or rejection of the proposed merger.

On September 12, InterNorth announced its offer to purchase 6,700,000 shares (approximately 54%) of Crouse–Hinds's stock at $40 a share. This purchase was to be followed by a second–step merger, in which

the remaining Crouse–Hinds shareholders would receive InterNorth preferred stock for their Crouse–Hinds common stock. The Tender Offer included the following clause, which has come to be called the "Belden Condition":

> The Offer is conditioned upon [the Belden merger's] being rejected by the shareholders of either [Crouse–Hinds] or Belden or the termination of such merger agreement by the parties thereto.

### C. The Initial Reactions to the Tender Offer

Crouse–Hinds first learned of the Tender Offer in a telephone call at 6:30 a. m. on September 12 from Samuel F. Segnar, President and Chief Executive Officer of InterNorth, to Chris J. Witting, Crouse–Hinds's Chairman and Chief Executive Officer. Segnar identified himself, explained InterNorth's organizational structure, and informed Witting that InterNorth's board had authorized the Tender Offer for Crouse–Hinds. Segnar told Witting that the offer would appear in that morning's edition of the Wall Street Journal. Witting asked some questions about InterNorth, and indicated, according to Segnar, that Crouse–Hinds would resist the Tender Offer.

Resistance was forthcoming on all fronts. The first formal step was taken by Belden. On September 15, Belden filed suit against InterNorth in an Illinois state court, alleging that InterNorth had tortiously interfered with Belden's business opportunities (the "Illinois action"). On September 16, the Illinois Court issued a temporary restraining order against the Tender Offer. On September 30, after four days of evidentiary hearings, the court issued a preliminary injunction enjoining InterNorth from taking any further action to proceed with the Tender Offer or with any other tender offer for Crouse–Hinds stock, and from interfering with "the Plan and Agreement of Merger ... dated September 8, 1980 and amended September 23, 1980." The injunction was to remain in effect until the

---

**3.** On September 11, 1980. InterNorth purchased 100 shares of Crouse–Hinds stock.

Crouse–Hinds and Belden shareholders had voted on the proposed merger, provided that the voting took place and the results were announced prior to December 1, 1980. *Belden Corp. v. InterNorth, Inc.*, No. 80 Ch. 6465 (Ill.Cir.Ct. Cook Co., October 1, 1980).[4] InterNorth has appealed from the granting of the injunction; the appellate court has refused to stay the injunction pending appeal.

In the meantime, on September 12, after receiving and reading the Tender Offer, Witting consulted two law firms which had been counsel to Crouse–Hinds over the years; and he instructed Lazard Freres, its long–standing financial adviser which had worked with Crouse–Hinds on the merger agreement, to analyze the Tender Offer from a financial point of view. Other directors of Crouse–Hinds were contacted, notified of a special meeting to be held on September 16, and advised not to formulate conclusions as to the adequacy of the Tender Offer until all of the pending analyses were completed. The collection and analysis of data with respect to InterNorth and its Tender Offer proceeded over the weekend of September 13–14, and on September 15 Lazard reported to Witting that the Tender Offer was inadequate from a financial point of view. On September 16 Crouse–Hinds's board met with the company's legal and financial advisers. On the advice of counsel, the board first considered the merits of InterNorth's offer, indepen-

dent of its effect on the merger to which the board was already committed. Based in part on the opinion of Lazard, the board decided to recommend that Crouse–Hinds shareholders reject the Tender Offer.

At that meeting Lazard also reaffirmed its previous advice that the Belden merger would benefit and enhance the value of Crouse–Hinds, and advised the board that the Tender Offer's goal of preventing that merger confirmed the view that the Tender Offer itself was financially inadequate. The board concurred in this judgment, reaffirming its belief that consummation of the proposed merger would strengthen Crouse–Hinds financially and offer it the opportunity to establish itself in new markets. The board therefore commenced to discuss ways to facilitate the consummation of the merger in light of InterNorth's opposition, and instructed management and counsel to explore, if appropriate, possible modifications to the merger agreement. No modifications were approved at that time, although the possibility of an exchange offer for Belden shares was discussed.

The board's reasons for its determination that the Tender Offer was not in Crouse–Hinds's best interests were set out in a Schedule 14D–9 statement filed with the Securities and Exchange Commission ("SEC").[5] In conformity with SEC rules that a target company report to its shareholders within 10 days the company's position, if any, with respect to a tender offer,[6]

---

**4.** The Illinois court found, *inter alia*, that InterNorth had determined as early as April 1980 that it would attempt to acquire Crouse–Hinds, and that InterNorth's President had attempted to induce Crouse–Hinds's President to breach the merger agreement, in part by assuring him that if the Tender Offer were successful he would retain his job.

**5.** The reasons set out in the Schedule 14D–9 for Crouse–Hinds's negative recommendation included: Lazard Freres' conclusion that the $40 per share offering price was inadequate (the closing price on September 11, the day before the InterNorth announcement had been $38 per share; since the Tender Offer the market price has been above $40 per share); the board's determination that the company and its shareholders would be better served by the company's remaining independent; that, based on

past performance, earning projections, and the state of the national economy, the present is an inopportune time to sell the company; that the intended acquisition by InterNorth was subject to a number of conditions and that projected future returns on InterNorth preferred shares compared unfavorably to that on Crouse–Hinds shares; that the merger with Belden, which would be precluded under "the Belden Condition" is in Crouse–Hinds's best interests; and uncertainty over whether ultimate consummation of the acquisition should be resolved by appropriate litigation.

**6.** SEC Rule 14e–2, 17 C.F.R. § 240.14e–2 (1980), provides in pertinent part:
*Rule 14e–2. Position of Subject Company with Respect to a Tender Offer.*
 (a) *Position of subject company.* As a means reasonably designed to prevent fraud-

Crouse–Hinds management on September 17 sent a letter to Crouse–Hinds shareholders recommending that they reject the InterNorth offer.[7]

## D. *The Exchange Offer*

Following the announcement of the Tender Offer, Crouse–Hinds and Belden entered into a new round of negotiations, and on September 23, the two companies agreed to a modification of their original merger agreement ("Exchange Agreement"). The preamble to the Exchange Agreement recited that the InterNorth Tender Offer sought rejection of the proposed merger and that the boards of directors of Belden and Crouse–Hinds continued to believe that the merger was in the best interests of their respective stockholders and therefore desired to take action in furtherance of the merger agreement.

The Exchange Agreement divided the originally planned one–step merger transaction into two parts. First, the Exchange Agreement required Crouse–Hinds to offer to exchange shares of its common stock for up to 7,733,871 shares (approximately 49%)[8] of Belden common stock, at the 1.24 to 1 ratio contemplated by the original merger agreement. The exchange was to be followed by a second–step merger on the same terms. Crouse–Hinds and Belden covenanted to use their best efforts to consummate the merger, and Crouse–Hinds agreed to vote its newly–acquired Belden shares for the merger. The Crouse–Hinds shares issued in exchange for the tendered Belden shares would not be entitled to vote on the proposed merger.[9]

The offer was to become effective. on October 3 and remain open until October 31. Belden stockholders who tendered before October 21 would have the right to have their shares accepted on a *pro rata* basis. The right to withdraw previously tendered shares would expire on October 24.[10] The shareholder votes on the merger would be conducted at special shareholders' meetings called for November 13 (for Crouse–

---

ulent, deceptive or manipulative acts or practices withing [*sic*] the meaning of Section 14(e) of the Act, the subject company, no later than 10 business days from the date the tender offer is first published or sent or given, shall publish, send or give to security holders a statement disclosing that the subject company:

(1) *Recommends acceptance or rejection* of the bidder's tender offer;

(2) Expresses no opinion and is remaining neutral toward the bidder's tender offer; or

(3) Is unable to take a position with respect to the bidder's tender offer.

Such statement shall also include the reason(s) for the position (including the inability to take a position) disclosed therein.

7. In addition to the actions described in the text, on September 19, Crouse–Hinds asked the Attorney General of the State of New York to investigate the Tender Offer under the New York Security Takeover Disclosure Act. Crouse–Hinds alleged that in June 1980 InterNorth had made an offering of debentures in order to raise funds for the Tender Offer and had improperly failed to mention Crouse–Hinds as target. (*See* note 4 *supra*.) On September 26 the Attorney General issued a temporary injunctive order against the Tender Offer; he has held two days of hearings and currently has the matter under consideration.

In addition, on September 23, Crouse–Hinds asked the Federal Energy Regulatory Commission to investigate the Tender Offer. Its petition to that agency alleges that the Tender Offer seeks to divert nearly $500 million from InterNorth's regulated energy business into an unrelated enterprise and thus constitutes an unreasonable practice proscribed by § 5 of the Natural Gas Act.

Finally, Crouse–Hinds refused to make a list of its shareholders available to InterNorth, a refusal that has led to litigation in the New York State courts. *See* note 11 *infra*.

8. This figure could be reduced to approximately 39% because Belden planned to call all of its outstanding 8% convertible subordinated debentures.

9. In order to accomplish the Exchange Offer and subsequent merger, Crouse–Hinds shareholders would have to vote to amend the certificate of incorporation to increase the number of authorized shares. A vote on this authorization was scheduled for the next shareholders' meeting.

10. We are informed that by October 23 the Exchange Offer had already been oversubscribed.

Hinds)[11] and for November 26 (for Belden). Crouse–Hinds would be relieved of its contractual obligation to purchase the Belden shares if it is enjoined from doing so for 45 days.

The Exchange Agreement would place several restrictions (commonly called "standstill provisions") on Crouse–Hinds's use and disposition of its newly–acquired Belden shares in the events that (a) it acquired more than 350,000 Belden shares and (b) the merger was rejected by shareholders or opposed by anyone who owned 40% or more of the common stock of either company. The restrictions included barring Crouse–Hinds from purchasing additional Belden shares and from seeking additional representation on Belden's board; requiring Crouse–Hinds to vote its Belden shares in the same manner as the majority of the remaining Belden stockholders; and giving Belden a right of first refusal, for nine months after the restrictions took effect, on any Belden shares that Crouse–Hinds wished to sell.

Although the Belden board approved the Exchange Agreement with Crouse–Hinds and viewed it as a step to facilitate the proposed merger, it refrained from recommending that Belden stockholders exchange their shares with Crouse–Hinds.[12] In part at least, Belden's decision not to recommend the exchange rested on the inability of its investment banker, Goldman Sachs, to render a fairness opinion on the Exchange Offer because InterNorth's opposition had threatened the planned merger.

Pursuant to the Exchange Agreement, Crouse–Hinds commenced the Exchange Offer on October 3. Its prospectus in connection with the Exchange Offer summarized the purpose of the offer as follows:

> The Boards of Directors of Crouse–Hinds and Belden approved the execution of the Exchange Agreement in order to facilitate consummation of the Merger in light of the IN Offer and to discourage IN from continuing with the IN Offer. Since Crouse–Hinds will vote all Belden Shares it acquires pursuant to the Offer in favor of the Merger, the acquisition of a substantial number of Belden Shares pursuant to the Offer will increase the likelihood of approval of the Merger by Belden's shareholders. The issuance of a substantial number of Crouse–Hinds Shares pursuant to the Offer would also facilitate the Merger in that it would increase the amount of cash which IN would have to pay and the amount of IN securities it would have to issue in order to achieve its stated purpose of acquiring Crouse–Hinds, which in turn may have the effect of dissuading IN from renewing the IN Offer.[13]

Again, in describing its purpose and its plans for Belden, Crouse–Hinds stated that the purpose of the offer was to acquire Belden shares

---

11. On October 30, 1980, a New York appellate court stayed the November 13 meeting pending decision of InterNorth's appeal of a lower court's denial of access to Crouse–Hinds's shareholders' list. The list apparently was made available to InterNorth on October 31, and on November 7 the order staying the November 13 shareholders' meeting was vacated. *See In re IN Holdings, Inc.*, Index No. 19464/80 (Sup.Ct.N.Y.Co.).

12. The Crouse–Hinds Prospectus in connection with the Exchange Offer stated as follows:

> The Board of Directors of Belden recognizes that there is uncertainty as to whether the Merger will be effected in accordance with its terms because, among other things, of the opposition of IN. Accordingly, the Belden Board has made no recommendation as to whether or not its shareholders should tender their shares for exchange and each

shareholder is advised to review this Prospectus carefully to make his or her own decision. The Belden Board, however, approved the Exchange Agreement because in its judgment the Offer facilitates the Merger and gives those shareholders desiring to exchange Belden Shares for Crouse–Hinds Shares the opportunity to do so.

13. The Prospectus also disclosed the statistics underlying these statements. As of September 16, 1980, there were 12,233,733 Crouse–Hinds shares outstanding, 363,376 reserved for conversion of preferred stock, and 331,302 reserved for stock options. 6,700,000 shares (the number sought by InterNorth's Tender Offer) represents approximately 52% of these outstanding or reserved shares. If 2,150,000 shares were issued pursuant to the Exchange Offer, 6,700,000 shares would amount to approximately 44%.

as a first step in acquiring the entire equity interest in Belden pursuant to the Merger Agreement. Under Delaware law, approval of a majority of all outstanding Belden Shares will be required to effect the Merger. Since Crouse–Hinds will vote all Belden Shares it acquires pursuant to the Offer in favor of the Merger, the acquisition of a substantial number of Belden Shares pursuant to the Offer will increase the likelihood of approval of the Merger by Belden shareholders. The issuance of a substantial number of Crouse–Hinds Shares pursuant to the Offer would also facilitate the Merger in that it would increase the amount of cash which IN would have to pay and the amount of IN securities it would have to issue in order to achieve its stated purpose of acquiring Crouse–Hinds, which in turn may have the effect of dissuading IN from continuing with the IN Offer.

### E. *The Present Litigation*

The present lawsuit was commenced by Crouse–Hinds against InterNorth on September 22 in the United States District Court for the Northern District of New York. The complaint alleged that the Tender Offer violated various provisions of the federal securities laws and the New York Business Corporation Law.[14] Crouse–Hinds sought an injunction restraining InterNorth from, *inter alia*, acquiring any Crouse–Hinds stock and soliciting or obtaining any proxies for the voting of Crouse–Hinds stock. Its motion for preliminary injunctive relief is presently *sub judice*.

On October 3, the day the Exchange Offer became effective, InterNorth filed its answer and the first of two counterclaims, alleging that the Exchange Offer lacked any valid business purpose, and that it was unfair to Crouse–Hinds shareholders because the "standstill" provisions that would become effective if the merger were not approved would inflict such substantial losses on Crouse–Hinds that any rational shareholder would vote to approve the merger.[15] This counterclaim seeks an injunction enjoining Crouse–Hinds from purchasing any shares of Belden stock, by its Exchange Offer or otherwise. Jurisdiction of the counterclaim is predicated on diversity of citizenship and principles of ancillary jurisdiction.

InterNorth immediately sought a preliminary injunction against Crouse–Hinds's purchasing any shares pursuant to the Exchange Offer, and the district court ordered Crouse–Hinds to show cause on October 7 why such a preliminary injunction should not be entered on October 24, the date on which Belden stock tenders would become irrevocable. Crouse–Hinds opposed the injunction and cross–moved to dismiss the counterclaims on jurisdictional, procedural and substantive grounds. Crouse–Hinds argued (a) that the court did not have ancillary jurisdiction over the counterclaims because the counterclaims were permissive

---

**14.** The original complaint alleged violations of §§ 14(a), 14(d), and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78n(d) and 78n(e) and § 5 of the Securities Act of 1933, 15 U.S.C. § 77c, as well as the S.E.C. rules and regulations promulgated thereunder. It also alleged violations of New York General Business Law, Article 23–A (the Martin Act). An amended complaint, dated September 24, added allegations under §§ 7, 8, and 16 of the Clayton Act, 15 U.S.C. §§ 18, 19 and 26.

**15.** On October 8, InterNorth filed a second counterclaim, which alleged that Crouse–Hinds had violated the Delaware Tender Offers Act, 8 Del.Code Ann. § 203, which requires that a Delaware corporation that is the target of a tender offer be given written notice of the intended offer "[n]ot less than 20 nor more than

60 days" before the date the offer is to be made. Crouse–Hinds had given Belden formal written notice on September 22, eleven days prior to the effective date of the Exchange Offer, noting that it did not concede the constitutionality of the Delaware provision, and stating that the notice merely confirmed prior discussions between the parties (and hence notice of the possibility of the Exchange Offer) on September 13, 1980. InterNorth alleged that

> [t]he sole purpose of such violation of law is to destroy defendants' opportunity to have the [InterNorth] Offer considered by the Crouse–Hinds shareholders before they are effectively committed, by virtue of the consummation of the Exchange Offer, to the Belden proposal.

rather than compulsory; (b) that the court lacked diversity jurisdiction because Belden, a Delaware corporation, was an indispensable party to the counterclaims, and if it were present there would be no diversity since InterNorth is also a Delaware corporation; (c) that InterNorth lacked standing to prosecute its counterclaims in its own right as a shareholder, or derivatively, or as a tender offeror; and (d) that the counterclaim should be dismissed as a matter of law because Crouse–Hinds's directors' actions in authorizing the Exchange Offer were protected by the business judgment rule.

## F. The District Court's Decision

In connection with InterNorth's injunction motion, the district court received several affidavits, excerpts from depositions, and a number of documents, including the merger agreement, the Exchange Agreement, the Exchange Offer prospectus and Crouse–Hinds's Schedule 14D–9. Two of the affidavits were submitted by investment bankers, one on each side, assessing the financial worth of the Exchange Offer. One affidavit was submitted by an attorney for Crouse–Hinds. Three affidavits were submitted by attorneys for InterNorth, principally stating InterNorth's contentions that the motivation of Crouse–Hinds's board for the Exchange Offer was solely to perpetuate its own control of the company, and that InterNorth would suffer irreparable injury if the Exchange Offer were consummated; one of these affidavits set forth a deposition answer by InterNorth Chairman Segnar quoting Witting as having stated in the September 12 telephone conversation that Crouse–Hinds was "prepared to give [InterNorth] a handful" on its Tender Offer. And an affidavit was submitted by Witting, describing the consideration given by the Crouse–Hinds board to the Tender Offer and the reasons it decided to oppose that offer. No other affidavits were submitted. No live testimony was offered.

In an order entered on October 23, with a detailed opinion filed on October 25, the district court denied Crouse–Hinds's motion to dismiss, and granted InterNorth's motion for a preliminary injunction barring Crouse–Hinds from acquiring any shares of Belden pursuant to the Exchange Offer.

The court rejected Crouse–Hinds's jurisdiction arguments on the ground that it had ancillary jurisdiction over the counterclaims because both the original claims and the counterclaims grew out of the same transaction, i. e., "the fight for the corporate control of Crouse–Hinds." (Opinion at 16). In light of this holding the court found it unnecessary to determine whether it also had diversity jurisdiction. Nevertheless, it indicated that it disagreed with Crouse–Hinds's contention that Belden was an indispensable party, because it saw a threshold question as to whether or not Crouse–Hinds had "authority" to enter into the Exchange Agreement; if it did not, Belden would have no contractual rights. (Id. at n.14.) The court also held that InterNorth had standing as a Crouse–Hinds shareholder to challenge alleged improper acts by the Crouse–Hinds board of directors. (Id. at 23).

Turning to the merits of InterNorth's counterclaims, the district court found that there was "certainly" evidence that in entering into the Exchange Agreement, the Crouse–Hinds board had acted to preserve its own control, because the board was to remain in office following consummation of the Belden merger. (Id. at 36.) Interpreting this Court's recent decision in Treadway Companies v. Care Corporation, 638 F.2d 357 (2d Cir. 1980), to mean that a director is "interested" in a merger for purposes of the business judgment rule if he will remain in office after consummation of the merger, the court concluded that the Crouse–Hinds board was "interested" in the Exchange Offer (Opinion at 36, 38), and ruled that the burden therefore shifted to the Crouse–Hinds directors to prove that the Exchange Agreement was fair and reasonable (id.). The court ruled that the business judgment rule and principles of negligence required Crouse–Hinds to "reconsider" the proposed Belden merger in light of the InterNorth

Tender Offer, and concluded that Crouse–Hinds had not met its burden, because it relied merely on the pre–Tender Offer evaluation of the Belden merger as reasonable. (*Id.* at 37). The court found that

> [a]lthough the independent investment advice sought and proffered by Crouse–Hinds is certainly some proof of its effort to reach an objective determination about the merits of InterNorth's tender offer, in view of the strength of the evidence to the contrary, and of applicable case law, the Court does not believe that [Crouse–Hinds] has sustained its burden of proof under the business judgment [rule].

(*Id.* at 38.) The court concluded "that in the present case there is no legitimate business purpose served by the exchange of stock between Crouse–Hinds and Belden." (*Id.* at 39.)

As to irreparable injury, the court stated as follows:

> While this Court does not believe that the Crouse–Hinds–Belden exchange offer would amount to a waste of Crouse–Hinds corporate assets it does believe that the offer, if allowed to proceed to fruition, would have resulted in a dilution of shareholders' equity and a disenfranchisement of the present Crouse–Hinds shareholders. According to both parties, the fruition of the exchange offer would also have resulted in rendering the present InterNorth tender offer moot. Such a deprivation of opportunity to the shareholders of both Crouse–Hinds and InterNorth constitutes irreparable injury to both.

(*Id.* at 41.)

The court concluded that InterNorth had satisfied the requirements for a preliminary injunction by showing irreparable injury, sufficiently serious questions going to the merits of its first counterclaim [16] to make them a fair ground for litigation, and the balance of hardships tipping decidedly to InterNorth. (*Id.*) *E. g., Seaboard World*

Airlines, Inc. v. Tiger International, Inc., 600 F.2d 355, 359–60 (2d Cir. 1979).

## II

On this appeal Crouse–Hinds renews its challenges to the district court's jurisdiction and to InterNorth's standing to maintain its counterclaims, and contends that the district court erred in each of its conclusions as to InterNorth's satisfaction of the requirements for a preliminary injunction. We deal here principally with the questions of the court's jurisdiction and its assessment of the merits of InterNorth's counterclaim.

### A. *Federal Jurisdiction of the Counterclaims*

■ InterNorth asserts that the district court has ancillary jurisdiction over the subject matter of its counterclaims on the ground that those counterclaims are compulsory because they arise out of the transaction that is the subject matter of Crouse–Hinds's complaint. The district court properly accepted this contention.

Ancillary jurisdiction is a concept which, *inter alia*, allows a federal court to adjudicate a compulsory counterclaim that does not independently meet the requirements for invocation of its jurisdiction. Crouse–Hinds contends that the court has no ancillary jurisdiction here because the counterclaims are not compulsory within the meaning of Fed.R.Civ.P. 13(a), which provides in relevant part as follows:

> *Compulsory Counterclaims.* A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the pleader need not state the claim if (1) at the time the action was commenced

---

**16.** The court found InterNorth's other contentions, including its claim of waste and its claim that the amount of notice given to Belden violated Delaware law, were either unsupported or too speculative to warrant preliminary injunctive relief. (*Id.* at 40.) We see no reason to disturb these conclusions.

the claim was the subject of another pending action . . . .

Crouse–Hinds relies chiefly on two theories to support this contention. First, it contends that since the complaint challenges the Tender Offer for Crouse–Hinds stock and the counterclaim challenges the Exchange Agreement relating to Belden stock, the transactions at issue are not the same. Second, it argues that the InterNorth attack on the Exchange Agreement need not be asserted as a counterclaim here because its adjudication would require the presence of a party over which the court cannot assert jurisdiction.[17]

We agree with the district court's conclusion that the claim and the counterclaim arise out of the same transaction. The leading case on ancillary jurisdiction is *Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926), in which the plaintiff sued the Cotton Exchange, contending that it had wrongfully refused to provide plaintiff with quotations; the Cotton Exchange asserted a counterclaim, seeking an injunction against the plaintiff's purloining quotations from it. Obviously the refusal to deal and the alleged theft were not the same transaction in the routine sense of the word. But the Supreme Court held the counterclaim compulsory, stating as follows:

> "Transaction" is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. The refusal to furnish the quotations is one of the links in the chain which constitutes the transaction upon which appellant here bases its cause of action. It is an important part of the transaction constituting the subject–matter of the counterclaim. It is the one circumstance without which neither party would have found it necessary to seek relief. Essential facts alleged by appellant enter into

and constitute in part the cause of action set forth in the counterclaim. That they are not precisely identical, or that the counterclaim embraces additional allegations, as, for example, that appellant is unlawfully getting the quotations, does not matter. To hold otherwise would be to rob this branch of the rule of all serviceable meaning, since the facts relied upon by the plaintiff rarely, if ever, are, in all particulars, the same as those constituting the defendant's counterclaim.

270 U.S. at 610, 46 S.Ct. at 371.

The logical relationship between the Exchange Offer and the Tender Offer is plain. Both Offers seek to affect consummation of the proposed merger between Crouse–Hinds and Belden: one seeks to further it, and the other seeks to thwart it. Crouse–Hinds concedes that the Exchange Offer was conceived as a response to the Tender Offer's threat to the merger. The "Belden Condition" imposed by the Tender Offer is the subject of several counts of Crouse–Hinds's complaint; at the same time it is a highly relevant factor in Crouse–Hinds's defense to the counterclaims' attack on the decision to make the Exchange Offer. We find no error in the district court's conclusion that the two claims have a clear logical relationship and an adequate factual overlap to warrant classification of the counterclaim as compulsory. *See Federman v. Empire Fire & Marine Insur. Co.*, 597 F.2d 798, 811–12 (2d Cir. 1979).

On the basis of the record as it now stands, we also reject Crouse–Hinds's argument that InterNorth's counterclaims are not compulsory because of the absence of Belden. We see no indication in the record that the court "cannot" acquire personal jurisdiction over Belden. We cannot leave this subject, however, without noting our disagreement with the district court's conclusion that the presence of Belden is not necessary for the adjudication of Inter-

---

17. Crouse–Hinds also argues that the counterclaim is the subject of the Illinois action and hence need not be pleaded here. While the Illinois court's order described the merger agreement as "dated September 8, 1980 and amended September 23, 1980" we see no indication that propriety of the amendment, *i. e.*, the Exchange Agreement, was the "subject of" that action.

North's counterclaims. The counterclaims seek to enjoin Crouse–Hinds's performance of the Exchange Agreement, to which Belden is a party and in reliance on which, we are informed, Belden has materially altered its financial structure.[18] The district court's view that the existence of Belden's contractual rights is dependent on a determination of Crouse–Hinds's "authority" to enter into the Exchange Agreement appears to misconstrue the nature of the claim actually asserted by InterNorth. The basis for the challenge to the Exchange Agreement is not that the Agreement was beyond the power or corporate authority of Crouse–Hinds or its directors; there is no question that a contract was entered into. Rather, InterNorth's substantive contention is that the contract is unfair; and its procedural contention is that under the business judgment rule the burden has shifted to the directors to prove the contract fair. (It should be noted that the business judgment rule has no application to contracts that are beyond the corporation's authority. *See* 2 Fletcher, Cyclopedia of the Law of Private Corporations § 505 (perm. ed. 1969).) Since there is no question that the Exchange Agreement is a contract that was within the powers of the corporation, and since Belden's rights thereunder would clearly be prejudiced if the relief sought by Inter-North were to be granted, Belden's presence is required. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 110, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); *Shields v. Barrow*, 58 U.S. 130, 139–40, 17 How. 130, 139–40, 15 L.Ed. 158 (1854); *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975), *cert. denied*, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976) ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable").

## B. *The Likely Merits of the Counterclaim*

The standard in this Circuit for the granting of a preliminary injunction requires the moving party to show

"(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Seaboard World Airlines, Inc. v. Tiger International, Inc., supra*, 600 F.2d at 359, quoting *Jackson Dairy Inc. v. H. P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979). Putting aside questions of injury and hardship, which we need not reach here, it is clear that under this test a party is not entitled to injunctive relief if he does not show either a likelihood of success on the merits of his claim or such substantial questions going to the merits as to make them fair ground for litigation. Our review of the record convinces us that InterNorth made neither showing, and that the granting of injunctive relief was an abuse of the district court's discretion.[19]

The InterNorth claim that the district court found presented substantial questions for litigation is the contention that the Exchange Offer has no valid business purpose and is designed merely to perpetuate Crouse–Hinds's management in office. The starting point for analysis of an attack by a shareholder on a transaction of the corporation is the business judgment rule. The New York Court of Appeals has recently stated the rule as follows:

---

**18.** In partial performance of its obligations under the Exchange Agreement, Belden has commenced the redemption of its outstanding convertible debentures.

**19.** As there was no evidentiary hearing in the district court and the injunction was granted on the basis of documents, deposition excerpts and affidavits, we are not limited to reviewing the district court's exercise of discretion but have the power to make a "full review." *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979). Given the record on which the decision was based, however, we have no doubt that the court's discretion was abused.

[The business judgment rule] bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. "Questions of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to their honest and unselfish decision, for their powers therein are without limitation and free from restraint, and the exercise of them for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient." (*Pollitz v. Wabash R.R. Co.*, 207 N.Y. 113, 124, 100 N.E. 721.)

\* \* \* \* \* \*

It appears to us that the business judgment doctrine, at least in part, is grounded in the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments. The authority and responsibilities vested in corporate directors both by statute and decisional law proceed on the assumption that inescapably there can be no available objective standard by which the correctness of every corporate decision may be measured, by the courts or otherwise. Even if that were not the case, by definition the responsibility for business judgments must rest with the corporate directors; their individual capabilities and experience peculiarly qualify them for the discharge of that responsibility. Thus, absent evidence of bad faith or fraud (of which there is none here) the courts must and properly should respect their determinations.

*Auerbach v. Bennett*, 47 N.Y.2d 619, 629–31, 419 N.Y.S.2d 920, 926–27, 393 N.E.2d 994 (1979); *compare Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971). In *Treadway Companies v. Care Corp., supra*, this Court summarized the workings of the business judgment rule as follows:

Under the business judgment rule, directors are presumed to have acted properly and in good faith, and are called to account for their actions only when they are shown to have engaged in self–dealing or fraud, or to have acted in bad faith. Once a plaintiff demonstrates that a director had an interest in the transaction at issue, the burden shifts to the director to prove that the transaction was fair and reasonable to the corporation. *Daloisio v. Peninsula Land Co., supra*, 127 A.2d at 893; *Geddes v. Anaconda Copper Co.*, 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425 (1921). Only if the director carries this burden will the transaction be upheld. *The initial burden of proving the director's interest or bad faith, however, always rests with the plaintiff.*

At 382 (emphasis added).

■ We find no basis in the present case for the district court's conclusion that Inter-North carried its burden of demonstrating self–interest or bad faith on the part of the Crouse–Hinds directors. As his starting point, the district judge gave extended consideration to the decision in *Treadway*, in which we found that because the Treadway directors, other than the chairman, were not to remain in office after the merger, perpetuation of their control could hardly have been their motivation for actions in furtherance of the merger. (*See id.* at 383.) Unfortunately, the district judge inferred from this that a quite different proposition must also be true–*i.e.*, that if the directors *are* to remain on the board after the merger, perpetuation of their control *must be presumed* to be their motivation. This inference has no basis in either law or logic.[20] *Treadway* did not disturb the normal requirement that a complaining shareholder present evidence of the di-

---

**20.** The proposition that "A implies B" is not the equivalent of "non–A implies non–B," and neither proposition follows logically from the other. The process of inferring one from the

rectors' interest in order to shift the burden of proof to them.[21]

■ Such evidence as was offered by InterNorth to support the contention that the Exchange Agreement was intended solely to perpetuate the Crouse–Hinds directors' control must be viewed in the context of the two most striking aspects of this controversy. First, the Crouse–Hinds directors had negotiated the proposed merger with Belden in the belief that the merger was in the best interests of Crouse–Hinds. They had no indication at that time that InterNorth had any interest in Crouse–Hinds. Their good faith and lack of "interest" in entering into the merger agreement are unchallenged. (Indeed, their bona fides could not be attacked by InterNorth, because it was not a Crouse–Hinds shareholder when the proposed merger agreement was entered into. Fed.R.Civ.P. 23.1(1); N.Y.Bus.Corp.Law § 626 (McKinney's 1963); *Wolf v. Frank*, 477 F.2d 467, 476 (5th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734–36 (3d Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971)). And the merger agreement required the Crouse–Hinds board to recommend approval by the shareholders.[22] Second, the InterNorth Tender Offer was expressly conditioned on the rejection or abandonment of the agreed–upon merger. There can be no genuine question that the Exchange Offer would increase the likelihood of consummation of the merger, since the Exchange Agreement requires Crouse–Hinds to vote all Belden shares acquired pursuant to the Exchange Offer in favor of the merger. In these circumstances, Crouse–Hinds's directors' attribution of the Exchange Offer to the facilitation of the merger they had negotiated is patently credible, at least in the absence of substantial evidence that their motives lie elsewhere.

The record support here for the contention and conclusion that the motivation for

---

other is known as "*the fallacy of denying the antecedent.*" J. Cooley, *A Primer of Formal Logic* 7 (1942).

**21.** In *Treadway*, for example, the conclusion that Treadway's chairman was "interested," was not based simply on the fact that he would remain in office following the merger. Rather, we noted that

> [t]here was ample evidence to support a finding that Lieblich acted improperly, and determined, for his own selfish reasons and without giving the matter fair consideration, to oppose a Care takeover at all costs.[50]
>
> [50] Most notable was the fact that Lieblich's view of the dollar value of the Fair Lanes merger proposal was apparently not affected in any way by his learning that, contrary to his prior assumption, certain Fair Lanes assets were to be excluded from the deal.
> At ———.

Further, it must be recognized that the focus on control motivation in *Treadway* and other authorities cited by InterNorth was necessitated by the special circumstances of a sale of corporate stock that would alter the voting power of the stockholders. InterNorth relies on these cases, involving sales similar to that in *Treadway*, or selective redemption of stock, or use of corporate funds to buy out an insurgent, and argues that the Crouse–Hinds Exchange Offer is "functionally identical." In fact it is not. In the cases relied on by InterNorth the actual voting percentages of "friendly" stockholders were increased and the voting percentages of "unfriendly" stockholders were reduced or eliminated. The present case is materially different. The Crouse–Hinds Exchange Offer neither increases nor decreases the voting power of any Crouse–Hinds shareholder in any relevant respect, since the Crouse–Hinds shares issued for the exchange will not be entitled to vote on the proposed merger. To the extent that the consummation of both the exchange and the merger will require an increase in Crouse–Hinds's authorized stock, such an increase is to be voted on by Crouse–Hinds shareholders.

InterNorth argues also that even if Crouse–Hinds shareholders are not actually disenfranchised, they will be coerced to vote for the merger because if they reject the merger the "standstill provisions" of the Exchange Agreement will result in a waste of Crouse–Hinds's assets. The district court refused to base the injunction on this theory, rejecting the contention that the Exchange Offer would amount to waste. *See* Opinion at 40–41. There is adequate evidence in the record to support its rejection.

**22.** We know of no support for the district court's view (Opinion at 37) that the Crouse–Hinds directors were required to "reconsider" the merger agreement that had been entered into and that they were contractually bound to recommend to shareholders. *See Casey v. Woodruff*, 49 N.Y.S.2d 625, 646 (Sup.Ct.N.Y. Co.1944).

the Exchange Agreement was retention of control is unusually sparse, if not non-existent. No live testimony whatever was offered below, even though subjective issues such as motivation are particularly inappropriate for decision on the basis of a documentary presentation. *S.E.C. v. Frank*, 388 F.2d 486, 492 (2d Cir. 1968); cf. *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir. 1979). No depositions were taken by InterNorth of Crouse–Hinds officials on the subject of motivation. Witting's affidavit–the only affidavit of anyone other than an attorney or an investment banker–contains no support for a finding of control motivation. What InterNorth relies on is (a) Witting's statement, upon hearing about the Tender Offer and the "Belden Condition," that Crouse–Hinds would resist the Tender Offer,[23] and (b) the statements in the Exchange Offer prospectus as to the goal of the Exchange Offer.[24] What Witting said, according to InterNorth's Chairman, was, "We are prepared to give you a handful." This statement plainly says nothing about retention of control. What the prospectus said is that the Exchange Offer seeks (1) to facilitate the merger with Belden and (2) to discourage the InterNorth Tender Offer. But it must be recognized that InterNorth's imposition of the "Belden Condition" had made these purposes merely opposite sides of the same coin.

Thus, none of the proffered statements is sufficient to show director "interest" of the sort that is needed under the business judgment rule to shift the burden of proof to the directors. In short, when the tender offeror has presented the target company

with an obvious reason to oppose the tender offer, the offeror cannot, on the theory that the target's management opposes the offer for some other, unstated, improper purpose, obtain an injunction against the opposition without presenting strong evidence to support its theory. We find no such evidence here.

We reverse so much of the district court's order as granted InterNorth's motion for a preliminary injunction and dismiss the appeal from the remainder of that order for want of appellate jurisdiction.

---

**23.** There is no statement in the Tender Offer that InterNorth would install a new Crouse–Hinds management; indeed, the Tender Offer states InterNorth has no such plans. InterNorth argues that if all its plans proceed to their intended conclusion, Crouse–Hinds will be a subsidiary company, with its board having to report to InterNorth, and that the Crouse–Hinds board would not be happy running a mere subsidiary company. This is far too meager a basis for a shifting of the burden of proof or the granting of a preliminary injunction.

**24.** The fact that the initial decision to oppose the Tender Offer was made in four days does

not prove that either that decision or the subsequent Exchange Agreement stemmed from a control motivation. Such decisions are required to be made promptly, see SEC Rule 14e–2, 17 C.F.R. § 240.14e–2 (1980), and are normally made quickly; and the district court recognized that this decision was not made without Crouse–Hinds having consulted its expert advisers in an effort to be objective. We note further that the Exchange Agreement, which is of course the precise target of the counterclaims, was not entered into until eleven days after announcement of the Tender Offer.