**WHITTAKER CORPORATION and BC Holdings, Inc., Plaintiffs,**

**v.**

**Jim EDGAR, Secretary of State of the State of Illinois; Brunswick Corporation; K. Brooks Abernathy; Jack F. Reichert; Sidney Davidson; John L. Hanigan; George D. Kennedy; Ian Macgregor; Charles P. Neidig; J. Donald Rauth; John T. Rettaliata; Pierre A. Rinfret; Edmund A. Stephan; and American Home Products Corporation, Defendants.**

**BRUNSWICK CORPORATION and Jack L. Meyerhoff, Counterplaintiffs,**

**v.**

**WHITTAKER CORPORATION; BC Holdings, Inc.; Joseph F. Alibrandi; Harry S. Derbyshire; and Daniel J. Hofmann, Counterdefendants.**

**No. 82 CR 443.**

United States District Court,
N. D. Illinois, E. D.

Feb. 25, 1982.

Mayer, Brown & Platt, Chicago, Ill., for plaintiffs.

Jenner & Block, Chicago, Ill., Kramer, Levin, Nessen, Kamin & Soll, New York City, Alan D. Jacobson, Los Angeles, Cal., for defendants.

## MEMORANDUM OPINION

FLAUM, District Judge:

This matter comes before the court on Whittaker Corporation's ("Whittaker") motion for a preliminary injunction to enjoin Brunswick Corporation ("Brunswick") from disposing of the stock or assets of Brunswick's subsidiary Sherwood Medical Industries, Inc. ("Sherwood") and Brunswick's motion for a preliminary injunction to enjoin Whittaker from proceeding with a tender offer for shares of Brunswick. The court has held a hearing in open court from February 8, 1982 to February 22, 1982, received into evidence extensive documents and deposition testimony, and considered hundreds of pages of memoranda submitted by the parties in support of and in opposition to the cross-motions for injunctive relief. Based upon all of the evidence submitted to the court and for the reasons set forth below, the court denies Whittaker's motion for a preliminary injunction and denies Brunswick's motion for a preliminary injunction. Accordingly, the court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

1. Plaintiff and counterdefendant Whittaker is a California corporation with its principal place of business in California. Whittaker is a diversified manufacturer and distributor of products in the fields of life sciences, metals, technology, marine, and chemicals.

2. Plaintiff and counterdefendant BC Holdings, Inc. ("BC Holdings") is a wholly-owned subsidiary of Whittaker which was incorporated in Delaware on January 21, 1982 for the purpose of making the tender offer for Brunswick shares.

3. Counterdefendant Joseph Alibrandi is the president and chief executive officer of Whittaker.

4. Counterdefendant Harry Derbyshire is the executive vice-president of Whittaker.

5. Counterdefendant Daniel Hofmann is a vice-president of Whittaker.

6. Defendant and counterplaintiff Brunswick is a Delaware corporation with its principal place of business in Illinois. Brunswick is a diversified manufacturer and distributor of products in the fields of energy, transportation, defense, aerospace, chemical processing, health care, and leisure.

7. Defendant and counterplaintiff Jack Meyerhoff ("Meyerhoff") is a Brunswick shareholder.

8. Defendant K. Brooks Abernathy ("Abernathy") is chairman of the board and chief executive officer of Brunswick.

9. Defendant Jack F. Reichert ("Reichert") is president and chief operating officer of Brunswick.

10. Defendants Abernathy, Reichert, Sidney Davidson, John Hanigan, George Kennedy, Ian MacGregor, Charles Neidig, Donald Rauth, John Rettaliata, Pierre Rinfret, and Edmund Stephan are directors of Brunswick.

11. Davidson, Hanigan, Kennedy, MacGregor, Neidig, Rauth, Rettaliata, Rinfret, and Stephan are independent directors of Brunswick. Stephan is a partner in the law firm of Mayer, Brown & Platt. Hanigan is a former officer of Brunswick.

12. Defendant Jim Edgar is the Secretary of State for the State of Illinois.

13. American Home Products Corporation ("American Home") is a Delaware corporation with its principal place of business in New York.

14. This court has subject matter jurisdiction over this cause of action pursuant to section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1980); section 16 of the Clayton Act, 15 U.S.C. § 26 (1980);

28 U.S.C. § 1331 (1980); 28 U.S.C. § 1337 (1980); and principles of pendent jurisdiction.

15. Venue is proper in this case under section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1980); section 12 of the Clayton Act, 15 U.S.C. § 22 (1980); and 28 U.S.C. § 1391(b), (c) (1980).

16. On January 26, 1982, Whittaker commenced a tender offer to purchase up to 10,400,000 shares of Brunswick common stock for $26.50 per share and up to $30,-000,000.00 of Brunswick's 10% convertible subordinated debentures due in 2006 for $1,234.28 per $1,000.00 principal amount of debentures ("the original Whittaker offer"). Whittaker reserved the right to increase the number of Brunswick common shares sought in the tender offer to 12,600,000 and to increase the number of debentures sought in the tender offer to all outstanding 10% convertible subordinated debentures. Whittaker made the tender offer through an offer to purchase ("the offer"). Whittaker mailed the offer to holders of Brunswick common stock and 10% debentures.

17. Whittaker values the Sherwood portion of Brunswick at $350,000,000.00. The value of Whittaker's offer for all of Brunswick is approximately $685,000,000.00.

18. Under the terms of the original Whittaker offer, the tender offer was to expire on February 23, 1982 unless extended by Whittaker. The withdrawal period was to expire on February 16, 1982 and the proration period was to expire on February 4, 1982. If more than 10,400,000 common shares of Brunswick were tendered as of the proration date of February 4, 1982 and not subsequently withdrawn, Whittaker was to purchase shares on a *pro rata* basis according to the number of shares tendered by each shareholder. Shares tendered after the proration date would not be purchased in the Whittaker offer. If more than $30,-

000,000.00 principal amount of debentures were tendered prior to the proration date and not withdrawn, Whittaker would purchase debentures on a *pro rata* basis according to the principal amount of debentures tendered by each holder as of the proration date. Debentures tendered after the proration date would not be purchased in the Whittaker offer. The original Whittaker offer was oversubscribed as of the proration date of February 4, 1982.

19. Under the terms of the offer, if Whittaker acquires all of the stock and debentures for which it has tendered, Whittaker will own approximately 49% of the outstanding common shares of Brunswick.[1] The tender offer states that, if Whittaker gains control of 49% of Brunswick's common shares, Whittaker intends to propose a merger between BC Holdings and Brunswick. Under the proposed merger, each Brunswick shareholder other than Whittaker[2] would exchange each share of Brunswick common stock for three-tenths of one share of a new Whittaker preferred stock which Whittaker contemplated that it would issue to Brunswick shareholders upon such a merger. The new Whittaker preferred stock would have a liquidation preference of $100.00 per share and would have been redeemable at Whittaker's option, at $100.00 per share or $30.00 per share of Brunswick stock exchanged in the merger following the third anniversary of issuance or at any time thereafter. Whittaker stated in the offer that the value of the new preferred stock exchanged for each share of Brunswick stock in the merger would be "more or less than $26.50."

20. While the original offer states that the value of the new preferred stock exchanged for each share of Brunswick in the proposed merger may be "more or less than $26.50," the value of the new preferred stock in Whittaker's view was approximately $24.00.

---

1. This includes the 394,100 Brunswick shares which Whittaker purchased on the open market prior to the tender offer.

2. The shareholders holding the 51% or more of the Brunswick stock would be those holders who did not or could not tender to Whittaker or whose shares were not accepted for purchase because of proration.

21. Whittaker's business operations with the Government of Saudi Arabia ("Saudi Arabia") generated approximately 46% of Whittaker's 1981 pre-tax profits.

22. In the original Whittaker offer, Whittaker states that it "administers health care programs for the Governments of Saudi Arabia and Abu Dhabi." The offer also states that "Whittaker's Saudi Arabian health care program, which commenced in the summer of 1974 and presently extends through August 1983 .... represents a significant portion of Whittaker's life sciences business and operating profits, and its loss would have a material adverse effect on Whittaker." The offer then refers the reader to the "Foreign Sales" subheading of the offer wherein Whittaker states that sales to Saudi Arabia included in the "Life Sciences" segment amounted to approximately $278,000,000.00 in fiscal 1981. Whittaker further states that approximately one-third of its sales are to customers outside the United States and that approximately 90% of foreign sales are accounted for by foreign operations. Whittaker's offer also states that such operations are "subject to certain special risks, including currency fluctuations, currency control regulations, settlement of contract disputes under foreign law, and the effect of international relations and the domestic affairs of foreign countries on business arrangements." The Whittaker offer further states that in 1980 Whittaker agreed with Khalid bin Abdullah bin Abdulrahman Al Saud ("Khalid"), the minority stockholder of Whittaker's Saudi Arabian subsidiary known as Whittaker Saudi Arabia Limited ("WSAL"), that Khalid's interest in Whittaker's future operations in Saudi Arabia in which he elects to participate, including a recent extension of the existing health care program, would be increased from 30% to 49%. The offer further states that, in "accordance with this agreement, Whittaker expects to sell shares representing 19% of the equity of the Saudi Arabian subsidiary to Khalid at book value during the second half of fiscal 1982." In appendix I to the offer, Whittaker sets forth the sales and operating profit figures for Whittaker's operations.

23. By a calculation of the figures contained in appendix I, it is possible to determine that Whittaker's sales to Saudi Arabia constitute approximately 17% of Whittaker's total sales for 1981 and that approximately 54% of Whittaker's total operating profits were generated from Whittaker's combined Middle Eastern operations. Whittaker does not state in the offer the book value of WSAL.

24. In 1978, Whittaker was encouraged by Saudi Arabia to begin purchasing all consumable hospital supplies from a company controlled by Sheikh Shamsudden Al Fassi ("Al Fassi"). Al Fassi was regarded by Alibrandi as having no experience in the business of providing hospital supplies. Alibrandi stated that he would not have chosen Al Fassi's company as the supplier. Whittaker agreed to pay Al Fassi, in addition to the cost of the medical supplies, a procurement fee of 10% of the value of all supplies purchased with a minimum fee of $2,000,000.00 per year.

25. In 1979, Saudi Arabia apparently requested that Whittaker form a joint venture to provide health care services to Saudi Arabia and to have Khalid become its partner in that venture. Khalid contributed approximately $750,000.00 in capital to the venture and Whittaker contributed about $1,720,000.00 plus the health care contract with Saudi Arabia.[3] Current book value of WSAL is approximately $5,850,000.00. Thus, Khalid's payment of book value for 19% of WSAL in 1982 will be approximately $1,110,000.00. Total earnings of WSAL for 1981 were approximately $59,758,000.00.

26. The original Whittaker offer states that Whittaker does not compete with Brunswick. Brunswick's Circle Seal subsidiary has produced and sold motor-operated aircraft valves for two years. In 1981,

3. Whittaker's health care contract with Saudi Arabia was valued at approximately $250,000,000.00 in 1977.

Brunswick sold approximately $3,000,000.00 worth of such valves. Whittaker has produced and sold motor-operated aircraft valves for approximately twenty years. In 1981, Whittaker sold approximately $6,000,000.00 worth of such valves. International Telephone and Telegraph ("ITT") also produces and sells motor-operated aircraft valves. The function of motor-operated aircraft valves is to control gasses and fluids in the pneumatic, hydraulic, and fuel systems of an airplane. There is no special trade name or common definition in the valve industry for a motor-operated valve. Testimony at the hearing established that pneumatic, hydraulic, solenoid, and sometimes even manual valves can be used to fulfill the functions of fluid and gas control in aircraft. These other types of valves are classified as remote-operated valves. In addition to Brunswick, Whittaker, and ITT, at least ten other United States companies and three Japanese companies compete in the area of motor-operated valves. Technological sophistication regarding the production of motor-operated aircraft valves is low, there are no patents necessary to produce such valves, and the necessary capital expenditure is not great for a remote-operated valve manufacturer to begin marketing motor-operated aircraft valves. The parties agree that the relevant geographic market for the valves is the entire United States.

27. In response to the original Whittaker tender offer, Brunswick hired three investment banking firms (Lehman Brothers Kuhn Loeb; Salomon Brothers; and Merrill Lynch White Weld Capital Markets Group) apparently in part to find a "white knight" to outbid Whittaker in the tender offer. The bankers presumably were unable to find a white knight. The investment bankers, however, did find two buyers including American Home who were willing to purchase Brunswick's Sherwood medical subsidiary.

28. Sherwood accounted for approximately one-third of Brunswick's after-tax earnings in 1981. In 1980, Sherwood accounted for $244,300,000.00 in net sales and $35,300,000.00 in operating earnings.

29. On February 9, 1982, a representative of Brunswick's investment bankers informed Whittaker that the bankers would recommend acceptance of a revised Whittaker offer if such an offer were "27/27-hard value" which meant a $27.00 cash per share offer for Brunswick's tendered shares, and, upon a merger of Whittaker and Brunswick, a debt instrument with a current value of $27.00 in exchange for each remaining Brunswick share.

30. On February 9, 1982, Brunswick's board of directors held its regularly scheduled February meeting. The investment bankers reported that there was no white knight. The Brunswick board considered the two possible offers for the sale of the Sherwood medical subsidiary.

31. On February 10, 1982, Whittaker announced a revised tender offer ("the revised Whittaker offer") which stated that it would purchase 49% of Brunswick's common stock shares for $27.00 per share and that the debentures would be purchased for $1,257.57 per $1,000.00 principal amount of debentures. The revised Whittaker offer also stated that Brunswick shareholders who did not or could not tender their shares for cash would receive in the proposed merger a $30.00 principal amount of a 16% subordinated debenture due in 1993. The revised Whittaker offer extended the termination date from February 23, 1982 to February 26, 1982. The original proration date of February 4, 1982 and the withdrawal date of February 16, 1982 remained the same under the revised Whittaker offer. The new debentures would be redeemable at Whittaker's option at any time after issuance in whole or in part at 100% of the principal amount together with accrued interest to the date of redemption. The new debentures would be redeemed through the operation of a sinking fund commencing approximately two years after their initial issuance. Sinking fund payments would be calculated to retire 90% of the debentures prior to maturity. Whittaker's revised offer states that the new debentures would have a value of "more or less than $27.00". Derbyshire testified that, in his opinion, the new debentures would be worth $26.00.

32. No additional information as to Whittaker's business dealings with Saudi Arabia or Whittaker's motor-operated aircraft valve business is contained in the revised offer.

33. On February 10, 1982, Brunswick's board of directors met in special session to consider three proposals: (1) the revised Whittaker offer; (2) the American Home proposal to acquire the Sherwood medical subsidiary; and (3) an unnamed party's $450,000,000.00 cash offer for the Sherwood medical subsidiary. The investment bankers advised the Brunswick board that blended value of the Brunswick stock would be "in the low 20's" because, after the exchange of Brunswick shares for Sherwood, Brunswick common stock would trade in a range between $11.00 and $16.00 per share. The investment bankers also advised the board that Brunswick stock would probably trade in a range between $25.00 and $27.00 per share if the board accepted the revised Whittaker offer. The board considered future earnings projections prepared by James Urbanek, a vice-president of Brunswick and former partner at Arthur Andersen and Company. Urbanek's projection showed earnings of approximately $4.50 per share after the redemption of American Home's approximately 14,000,000 shares. Applying a price-earnings multiple of six which was regarded by the board as a low-end estimate of value for Brunswick without Sherwood, the board determined that the American Home offer presented a $30/$27 deal for Brunswick shareholders while the revised Whittaker offer presented a $27/$26 deal for Brunswick shareholders. The investment bankers then advised the board that, in light of the disparate nature of the three proposals before the board, it was not possible for them to render an opinion comparing these alternatives from a financial viewpoint. The investment bankers also stated that, because of the difficulty in predicting the future results of Brunswick operations following the disposition of Sherwood, it was not possible for them to render a quantitative opinion as to the value of the proposed disposition of Sherwood from a financial point of view. The invest-ment bankers further stated that the decision essentially was one to be made by the directors in exercising their independent business judgment. Leo Herzel, a senior partner of Mayer, Brown & Platt, Brunswick's legal counsel, who was present at the meeting, stated that Mayer, Brown & Platt was prepared to give a legal opinion that there was a "proper legal basis" for the conclusion that the disposition of the Sherwood medical subsidiary would not be taxable to Brunswick. Apparently based upon this opinion of Brunswick's legal counsel that the transaction would be tax-free to Brunswick, the Brunswick board accepted in principle American Home's offer. The allegedly tax-free nature of the American Home proposal apparently was a crucial element in the Brunswick board's approval of the proposal. Finally, several of the directors at the February 10, 1982 board meeting expressed concern about the size of the debt proposed to be issued by Whittaker in the form of new debentures which would follow the merger of Whittaker and Brunswick, particularly in light of Whittaker's dependence upon profits from its health care program with Saudi Arabia.

34. Arthur Rollin ("Rollin") a partner of Mayer, Brown & Platt who specializes in tax law, reaffirmed Herzel's tax advice to the Brunswick board in a telephone call with the board on February 13, 1982.

35. On February 13, 1982, Brunswick and American Home entered into an agreement which provides for the acquisition by American Home of all of the outstanding capital stock of Sherwood and the stock of certain other Brunswick medical subsidiaries ("the Sherwood medical group"). Under the terms of this agreement, American Home agreed to commence a tender offer for up to 14,166,666 shares of Brunswick common stock at a purchase price of $30.00 per share or at such higher price as shall be mutually agreed upon by Brunswick and American Home. The agreement further provides that Brunswick will distribute the Sherwood medical group stock to American Home in redemption of up to 13,772,000 shares of Brunswick common stock acquired

by American Home under the tender offer at a rate of one share of the Sherwood medical group stock for each 13,772 shares of Brunswick common stock. The agreement also provides that, if after such distribution, American Home continues to own additional Brunswick shares, Brunswick will exchange additional shares of its medical group other than Sherwood in exchange for up to 394,666 shares of Brunswick. The agreement further provides that Brunswick will sell to American Home any medical group stock remaining after this redemption for a purchase price of $413,160.00 per share of medical subsidiary stock or for certain prices for shares of medical subsidiaries other than Sherwood. The agreement states that the total consideration to be paid by American Home for Brunswick shares purchased under the tender offer and for medical subsidiary shares acquired for cash will be $425,000,000.00. The agreement also provides that, in the event that American Home is prevented from purchasing Brunswick shares because the American Home tender offer is enjoined or does not otherwise go forward, American Home has the right to purchase the medical subsidiary group for $450,000,000.00 in cash.

36. The American Home tender offer commenced on February 16, 1982. Under rule 14d–7 of the Securities and Exchange Commission, the commencement of American Home tender offer automatically extended the withdrawal date of the revised Whittaker offer for ten business days to March 2, 1982. The proration date for the American Home offer is February 25, 1982. The withdrawal and termination dates for the American Home offer is March 2, 1982.

37. On February 16, 1982, Brunswick issued a letter from Abernathy to Brunswick shareholders recommending that the Brunswick shareholders tender their stock to American Home. On page one and page seven of the letter to the shareholders, in bold-faced type and all capital letters, the letter states that:

**THE BOARD OF DIRECTORS OF BRUNSWICK HAS DETERMINED THAT THE TERMS OF THE AHP OFFER ARE FAIR AND RECOMMENDS THAT HOLDERS OF BRUNSWICK COMMON STOCK TENDER THEIR SHARES. THE BOARD OF DIRECTORS MAKES NO RECOMMENDATION AS TO WHETHER HOLDERS OF 10% DEBENTURES, 4½% DEBENTURES OR PREFERRED STOCK SHOULD CONVERT THEIR SECURITIES AND TENDER.**

The letter also states on page eight that the investment bankers "stated that they believed that the [Brunswick] shares would sell at a higher price following the announcement of the amended Whittaker offer, as then proposed, than if Brunswick were to announce its acceptance of the AHP proposal." The letter also indicates that Brunswick dividends paid in the past may not be paid following the American Home sale. Mayer, Brown & Platt's opinion as to the tax consequences of the Sherwood transaction is set forth in the American Home offer and the letter to Brunswick's shareholders. The opinion states that, in Mayer, Brown & Platt's opinion, the transaction will not be taxable to Brunswick, that there is no legal precedent exactly on point, and that the Internal Revenue Service may assert a contrary position. The offer and letter to shareholders state that a small portion of the transaction relating to shares of certain medical subsidiaries other than Sherwood will be taxable to Brunswick.

38. The letter does not state that the investment bankers advised the Brunswick board that the blended value of the revised Whittaker offer is in the $25.00 to $27.00 range and the blended value of the American Home offer is in the "low 20's" range, nor that the investment bankers advised the board that Brunswick without Sherwood would trade in the $11.00 to $16.00 range.

39. Regarding costs to be incurred by Brunswick in connection with the American Home deal, Brunswick has a long-term debt with Prudential Insurance Company ("Prudential") of approximately $141,000,000.00 at the following interest rates: $44,000,-

000.00 at 10% through 1995; $47,000,000.00 at 9¾% through 1996; $50,000,000.00 at 8.9% through 1998. Prudential's consent was required for the American Home proposal, but not under the Whittaker proposal. Prudential required that Brunswick prepay $50,000,000.00 in debt and incur additional interest costs based upon the sale of Sherwood to American Home. In addition, since Brunswick warranted to American Home that Sherwood has a net book value of $185,000,000.00, Brunswick must contribute an additional $10,400,000.00 to Sherwood. Brunswick also will incur an estimated $3,500,000.00 in foreign taxes associated with the transaction with American Home. Finally, Brunswick will incur approximately $25,000,000.00 in other expenses, including approximately $3,000,000.00 in investment bankers' fees.

40. Regarding the tax-free nature of the American Home tender offer, Ross Stemer ("Stemer"), management spokesperson for Brunswick, was quoted—accurately according to Stemer's own testimony—as stating that the American Home offer would not be taxable and that the American Home offer thus was worth about $490,000,000.00. Stemer also was quoted by the Wall Street Journal that the American Home offer is "tax-free".

41. The letter to Brunswick shareholders states that there is a possibility that the distribution to tendering shareholders under the American Home offer may be treated as a dividend on the full $30.00 per share tender price. Neither Herzel nor Rollin told the Brunswick board during the meetings on February 10 and 13 that the American Home offer might be taxable to Brunswick shareholders as a dividend.

42. Professor Bernard Wolfman of Harvard University Law School testified that, in his opinion, the American Home transaction would be taxable to Brunswick. Professor Marvin Chirelstein of Yale University Law School and Professor Douglas Kahn of the University of Michigan Law School testified that, in their opinion, the American Home transaction would not be taxable to Brunswick.

43. If the Sherwood sale to American Home is found to be taxable to Brunswick, tax liability would reduce the consideration received for Sherwood by approximately $60,000,000.00 to $70,000,000.00.

44. Whittaker has indicated that, if Whittaker is unable to obtain Brunswick with the Sherwood medical subsidiary, Whittaker will withdraw its revised tender offer for Brunswick.[4]

45. On January 27, 1982, Whittaker initially filed suit in this court against the Illinois Secretary of State and Brunswick seeking to enjoin the Illinois Secretary of State from enforcing the Illinois Business Takeover Act.[5]

46. On January 28, 1982, Brunswick and Meyerhoff filed a counterclaim against Whittaker, BC Holdings, Inc., Alibrandi, Derbyshire, and Hofmann alleging that the original Whittaker offer violates sections 14(d) and 14(e) of the Williams Act, that Whittaker breached its fiduciary duty to Brunswick shareholders, and that the proposed merger of Brunswick and Whittaker violates section 7 of the Clayton Act. Brunswick's counterclaim forms the basis of its motion for a preliminary injunction which seeks to enjoin the revised Whittaker offer on the following grounds: (1) Whittaker's tender offer document allegedly omits material facts regarding Whittaker's Saudi Arabian operations in violation of the Williams Act; (2) since Whittaker has not altered the proration date in the revised offer, the revised terms do not alleviate the alleged harm caused to the Brunswick shareholders by the misstatements in the

---

4. Thus, while the court is addressing both motions for injunctive relief, the denial of an injunction enjoining the Sherwood sale which results in Whittaker withdrawing its tender offer in essence will moot Brunswick's claims for injunctive relief regarding the Whittaker tender offer.

5. The Illinois Business Takeover Act allegations are not the subject of the motions for injunctive relief presently before the court.

original offer because a shareholder induced not to tender his shares in reliance upon the prospect of receiving securities in the merger with Whittaker cannot participate in the revised Whittaker offer; and (3) the proposed merger of Brunswick and Whittaker allegedly would tend to diminish competition in the market for motor-operated aircraft valves in violation of section 7 of the Clayton Act.

47. On February 23, 1982, Whittaker filed a verified supplemental complaint against Brunswick, the Brunswick board of directors, and American Home. The supplemental pleading alleges claims and facts that have arisen since the filing of the second amended complaint but does not replace or supplant that complaint. The supplemental complaint alleges that Brunswick, Brunswick's board, and American Home have violated section 14(e) of the Williams Act by giving American Home a "lock-up" contract to purchase the Sherwood medical group; by materially misrepresenting the Sherwood sale as tax-free when the transaction is likely to be taxable to Brunswick and treated as a dividend to Brunswick shareholders as well as materially misrepresenting the $100,000,000.00 in costs to be incurred by Brunswick in connection with the American Home transaction and how these expenses will be paid; and by improperly presenting in bold-face type the board's recommendation of the American Home proposal in a letter to Brunswick's shareholders while making misrepresentations and omitting certain material facts regarding the impact of the Sherwood sale on Brunswick shareholders. Whittaker has moved for a preliminary injunction seeking to enjoin the sale of Sherwood to American Home.[6] Whittaker seeks a preliminary injunction on the following grounds: (1) Brunswick allegedly has violated section 14(e) of the Williams Act by entering into an unlawful lock-up arrangement with American Home; by engaging in fraudulent, deceptive, and manipulative acts by thwarting the Whittaker tender offer by a purportedly tax-free transaction

which cannot fairly compete in the market place; and by sending a letter to Brunswick shareholders in support of the Sherwood sale which contains material misrepresentations; (2) Brunswick's management has breached its fiduciary duties owed to Brunswick shareholders; and (3) Brunswick's proposed sale of the Sherwood medical group to American Home requires shareholder approval under section 271 of Tit. 8 of the Delaware Corporation Code.

The Brunswick and Whittaker motions for injunctive relief will now be addressed by the court.

## CONCLUSIONS OF LAW

1. The issuance of a preliminary injunction is the court's exercise of an extremely far reaching power and should not be granted except in a case which clearly warrants it. *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976). The criteria for a preliminary injunction are well-established: (1) the plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (2) the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; (3) the plaintiff has at least a reasonable likelihood of success on the merits; and (4) the granting of a preliminary injunction will not disserve the public interest. *Reinders Brothers, Inc. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 48–49 (7th Cir. 1980), *citing Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976). A preliminary injunction cannot be granted unless the plaintiff carries its burden of persuasion as to all of these elements. *Id.*

2. The failure to disclose material information in connection with the purchase or sale of securities causes irreparable harm sufficient to warrant injunctive relief. *Stecher-Traung-Schmidt Corp. v. Self*, 529 F.2d 567, 568–69 (2d Cir. 1976).

---

**6.** Whittaker also requested, on two separate occasions, the entry of a temporary restraining order to restrain Brunswick from disposing of Sherwood. Both motions were denied.

■ 3. A manipulative act regarding a tender offer in violation of section 14(e) of the Williams Act is an appropriate basis for injunctive relief. *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 [Current] Fed.Sec.L. Rep. (CCH) ¶ 98,399 (6th Cir. 1981).

■ 4. The issuance of a preliminary injunction also is appropriate to prevent the probable lessening of competition in violation of section 7 of the Clayton Act. *See FTC v. Rhinechem Corp.*, 459 F.Supp. 785, 788 (N.D.Ill.1978); *Chemetron Corp. v. Crane Co.*, [1977–2] Trade Cases (CCH) ¶ 61,717 (N.D.Ill.1977).

5. Applying the standard necessary for the issuance of a preliminary injunction to the facts of this case, the court concludes that both Brunswick and Whittaker have met the elements of no adequate remedy at law and irreparable harm. Moreover, assuming that either party were successful on the merits, the threatened injury to the other party would be outweighed and the public interest would be served. The court concludes, however, that both Brunswick and Whittaker have failed to establish a reasonable likelihood of success on the merits of their various claims against each other.

6. Section 14(e) of the Securities Exchange Act of 1934 as amended by the Williams Act of 1968 provides that it is unlawful "to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, are not misleading ... in connection with any tender offer or request or invitation for tenders ...." 15 U.S.C. § 78n(e) (1980).

7. The Williams Act of 1968 was enacted "to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975). Thus, section 14(e) of the Williams Act requires disclosure of material facts to the investor. *Piper v. Chris-*

*Craft Industries, Inc.*, 430 U.S. 1, 30–31, 97 S.Ct. 926, 943–944, 51 L.Ed.2d 124 (1977).

■ 8. For the purpose of section 14(e) of the Williams Act, an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. *Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 360 (2d Cir. 1979). *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 3132, 48 L.Ed.2d 757 (1976) (material omissions in proxy statement). Thus, not every misstatement or omission in a tender offer has legal significance under the Williams Act. *Id.* Rather, the policy underlying the Williams Act is "to provide investors with information relevant to a tender offer and allowing both the offeror and the incumbent management of a target company to present fully their arguments and then let the investor decide for himself." *MITE Corp. v. Dixon*, 633 F.2d 486, 492 (7th Cir. 1980), *cert. granted*, —— U.S. ——, 102 S.Ct. 380, 70 L.Ed.2d 202 (1981).

■ 9. In tender offer situations, foreign controls, particularly when they differ in extent and kind from controls an American investor has come to expect from the United States government in relation to domestic corporations, are matters which should be called to the attention of shareholders in a tender offer. *General Host Corp. v. Triumph American, Inc.*, 359 F.Supp. 749, 758 (S.D.N.Y.1973).

■ 10. A tender offeror who has been involved in making questionable foreign payments pursuant to its overseas operations is required to disclose the nature and scope of such transactions. *Berman v. Gerber Products Co.*, 454 F.Supp. 1310, 1323 (W.D.Mich.1978).

■ 11. A corporate disclosure in connection with a tender offer which uses bold-faced type in a materially misleading manner violates the federal securities laws, as does the failure to give adequate prominence or emphasis to material facts in the disclosure document. *See Mills v. Electric*

*Autolite Co.*, 403 F.2d 429, 435 (7th Cir. 1968), *vacated on other grounds and remanded sub nom., Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

12. A tender offer will be enjoined where the tender offeror's amendment to the offer is insufficient and does not change the proration date such that shareholders who did not tender shares in reliance upon a material misrepresentation or omission contained in the first offer do not have an opportunity to participate in the new offer. *Life Investors, Inc. v. AGO Holding, N.V.*, [Current] Fed.Sec.L.Rep. ¶ 98,356 (8th Cir. 1981).

13. In the present case, Brunswick alleges that Whittaker made material misrepresentations and/or omissions in violation of section 14(e) of the Williams Act by failing to adequately disclose Whittaker's business dealings with Saudi Arabia and by materially misrepresenting the value of the new preferred stock in the original offer such that investors relied upon the material misrepresentations and were unable to tender their shares when Whittaker revised its offer but did not extend the proration date which already had expired. Applying the law to the facts as to Whittaker's Saudi Arabian disclosures, the court determines that Whittaker's conduct does not rise to the level of a material misrepresentation or omission in violation of section 14(e) of the Williams Act. While Whittaker did not choose to fully disclose the nature of and the personalities involved in its business dealings with Saudi Arabia, those facts dealing with the structure of the WSAL venture and the supply arrangement with Al Fassi omitted by Whittaker in the tender offer are not found by the court to be material within the meaning of section 14(e) of the Williams Act in the context of the disclosure. As to Whittaker's alleged misrepresentation of the value of the new preferred stock in the original offer, the court concludes that Whittaker did not misstate or omit a material fact within the meaning of section 14(e) of the Williams Act. The original Whittaker offer stated that the new preferred stock would have a value of "more or less than $26.50." The evidence before the court established that the actual value of the new preferred stock would have been approximately $24.00. The court concludes that this is not a material misstatement or omission under section 14(e) of the Williams Act.

14. Whittaker alleges that Brunswick violated section 14(e) of the Williams Act by making material misrepresentations as to the tax-free nature of the Sherwood sale to American Home and by sending a letter to Brunswick shareholders in support of the Sherwood sale which allegedly contains material misrepresentations. Applying the law regarding material misrepresentations and omissions in violation of section 14(e) of the Williams Act to the facts established regarding Brunswick's representations as to the tax-free nature of the Sherwood sale to American Home, the court determines that Brunswick has not made material misrepresentations or omissions in violation of section 14(e). While Brunswick has not fully disclosed all of the possible tax ramifications of the Sherwood sale to its shareholders either in the American Home offer or the letter to the shareholders and although the court does not approve of the form of certain Brunswick statements to the press that the Sherwood sale is "tax-free", the court finds that Brunswick has adequately disclosed to its shareholders the possible tax consequences of the Sherwood sale in the American Home offer and the letter to the shareholders. Thus, the court concludes that Brunswick's statements regarding the tax consequences of the Sherwood sale do not rise to the level of a material misrepresentation or omission in violation of section 14(e) of the Williams Act. Regarding the use of bold-face type in the Brunswick letter to the shareholders, the court concludes that, while such print perhaps is inappropriate in a letter to shareholders, the use of bold-face type in this case is not a violation of section 14(e) of the Williams Act. Finally, regarding the alleged $100,000,000.00 in costs to be incurred by Brunswick as a result of the Sherwood

sale, the evidence has established that, while Brunswick does not specifically provide a total cost figure, the costs and taxes of the Sherwood sale are adequately disclosed in the American Home offer and Brunswick's letter to the shareholders. Thus, the court concludes that Brunswick has not made a material misrepresentation or omission in violation of section 14(e) of the Williams Act as to the costs to Brunswick regarding the Sherwood sale.

15. Section 14(e) of the Williams Act also provides that it is unlawful "to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders." 15 U.S.C. § 78n(e) (1980).

16. Whittaker, as a tender offeror, has standing to allege a private cause of action for injunctive relief under section 14(e) of the Williams Act regarding the disposition of the Sherwood medical subsidiary. *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,399 (6th Cir. 1981).

17. A mere breach of fiduciary duty does not constitute a violation of section 14(e) of the Williams Act. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977).

18. In *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,399 (6th Cir. 1981), Mobil Corporation ("Mobil") announced a tender offer to purchase up to 40,000,000 shares of stock of Marathon Oil Company ("Marathon") at $85.00 per share with the intention of acquiring the balance of Marathon stock by merger. *Id.* at p. 369, [Current] Fed.Sec.L. Rep. (CCH) at p. 92,386. Marathon began a search for a "white knight" and found one in United States Steel ("U. S. Steel"). *Id.* at p. 367, [Current] Fed.Sec.L.Rep. (CCH) at p. 92,387. U. S. Steel offered what it termed to be a "final proposal" to Marathon to be acted upon on the same day as the proposal was made. *Id.* Under the proposal, U. S. Steel offered $125.00 per share for 30,000,000 shares of Marathon stock with a plan for a follow-up merger with a U. S. Steel subsidiary. *Id.* The U. S. Steel offer

and merger agreement was subject to the following conditions: (1) an irrevocable option for U. S. Steel to purchase 10,000,000 authorized but unissued shares of Marathon common stock for $90.00 per share (approximately 17% of Marathon's outstanding shares) and (2) an option for U. S. Steel to purchase Marathon's 48% interest in oil and mineral rights in the Yates Field Oil Reserve ("Yates Field"). *Id.* at p. 367, [Current] Fed.Sec.L.Rep. (CCH) at p. 92,388. This latter option could be exercised only if U. S. Steel's offer did not succeed and if a third party gained control of Marathon. *Id.* Mobil then amended its offer to $126.00 per share with the express condition that the U. S. Steel options be declared invalid. *Id.* The Yates Field is Marathon's "crown jewel" with what were found by the Sixth Circuit to be "unique characteristics" of massive oil production for the next ninety years with approximately 3,500,000,000 barrels of oil still in place. *Id.* The importance of Yates Field to a potential tender offeror of Marathon is illustrated by the fact that two companies indicated that they would propose a tender offer for Marathon but only upon assurances that they would have an option to buy Marathon's interest in Yates Field. *Id.* Mobil sought to enjoin the U. S. Steel options, contending *inter alia* that the offer was a manipulative device in violation of section 14(e) of the Williams Act. *Mobil Corp. v. Marathon Oil Co.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,375 (S.D. Ohio 1981). The district court concluded that, while the other elements necessary for injunctive relief were present in the case, Mobil had failed to establish a reasonable likelihood of success on the merits as to its claim under section 14(e) of the Williams Act. *Id.* at p. 92,285. On appeal, the United States Court of Appeals for the Sixth Circuit reversed on the issue of a violation of section 14(e) of the Williams Act. *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 at p. 369, [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,-399 at p. 92,391 (6th Cir. 1981). In so doing, the Sixth Circuit first determined that Mobil, as a tender offeror, has a private cause of action for injunctive relief under section

14(e) of the Williams Act. *Id.* at p. 372, [Current] Fed.Sec.L.Rep. (CCH) at p. 92,-397. After determining that Mobil has an implied cause of action under section 14(e), the Sixth Circuit addressed the issue of whether the lock-up options granted to U. S. Steel constituted a manipulative act in violation of that section. *Id.* at p. 373, [Current] Fed.Sec.L.Rep. (CCH) at p. 92,-400. The Sixth Circuit, while noting that the term "manipulative" is not defined in either the Securities Exchange Act or the Williams Act, determined that "manipulation is an affecting of the market for, or price of, securities by *artificial* means, i.e., means unrelated to the natural forces of supply and demand." *Id.* The court went on to quote the United States Supreme Court's definition of manipulative as "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Id. quoting Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1374, 47 L.Ed.2d 668 (1976) (footnote omitted). The Sixth Circuit then concluded that:

> In our view, it is difficult to conceive of a more effective and manipulative device than the "lock-up" options employed here, options which not only artificially affect, but for all practical purposes completely block, normal healthy market activity and, in fact, could be construed as expressly designed solely for that purpose.

at p. 374, [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,399 at p. 91,401. The *Mobil* court then held that *"under the circumstances of this particular case,* Mobil has shown a sufficient likelihood of ultimately establishing that the Yates Field option and the stock option had the effect of creating an artificial price ceiling in the tender offer market for Marathon common shares, and that the options therefore are 'manipulative acts or practices' in connection with a tender offer in violation of section 14(e) of the Williams Act." *Id.* at p. 375, [Current] Fed.Sec.L. Rep. (CCH) at p. 92,402–03 (emphasis added). The Sixth Circuit went on to conclude that there was ample evidence in the record to support the district court's finding that Yates Field is a unique and significant asset as well as a very important attraction to potential tender offerors for Marathon:

> The Yates Field option which [U. S. Steel] demanded and received in connection with its tender offer of $125 per share greatly dampens the demand by Mobil and other potential bidders in the tender offer market, because a successful takeover by any bidder other than [U. S. Steel] will give [U. S. Steel] the right to exercise its option and purchase the Yates Field interest for $2.8 billion. This presents a significant threat to other bidders that even if they gain control of Marathon they will lose the Yates Field oil reserves.

*Id.* at p. 375, [Current] Fed.Sec.L.Rep. (CCH) at p. 92,402. Moreover, the Sixth Circuit noted that evidence presented to the district showed that Yates Field might be worth as much as $3,639,000,000.00 rather than $2,800,000,000.00 which Marathon would receive from U. S. Steel to further buttress the courts' conclusion that Mobil and other potential bidders for control of Marathon might be willing to make tender offers reflecting a Yates Field valuation "far greater than" the U. S. Steel price, were it not for U. S. Steel's lock-up option. *Id.* The Sixth Circuit went on to state:

> The Yates Field option is exercisable if, and only if, control of Marathon is obtained by a third party. *The only effect of this option can be to deter Mobil and any other potential tender offerors from competing with [U. S. Steel] in an auction for control of Marathon.* Others cannot compete on a par with [U. S. Steel]; its bid of $125 per share thus amounts to an artificial ceiling on the value Marathon shareholders can receive for their shares. Therefore, there is a substantial likelihood that the option is manipulative under section 14(e) of the Williams Act.

*Id.* at 375, [Current] Fed.Sec.L.Rep. (CCH) at 92,402–03 (emphasis added). Regarding the stock option for authorized but unissued shares, the Sixth Circuit concluded that the size and price of the stock option granted to U. S. Steel, a tender offeror for Marathon, prevented all other potential tender offer-

ors from competing on a par with U. S. Steel for a controlling block of Marathon shares and "tipped the scales decidedly in favor of [U. S. Steel]." *Id.* at p. 376, [Current] Fed.Sec.L.Rep. (CCH) at p. 92,404. Thus, the *Mobil* court concluded that the stock option to U. S. Steel artificially and significantly discouraged competitive bidding for the Marathon stock. The Sixth Circuit further stated that the "Yates Field option and the stock option, both individually and in combination, have the effect of circumventing the natural forces of market demand in this tender offer contest." *Id.* Thus, the court held that both options "under the circumstances of this tender offer" constitute manipulative acts in violation of section 14(e) of the Williams Act. *Id.* at p. 377, [Current] Fed.Sec.L.Rep. (CCH) at p. 92,406.

19. While the Sixth Circuit's opinion in *Mobil* is not binding precedent in this circuit, the court concludes that Whittaker, as a tender offeror, has standing to allege a private cause of action for injunctive relief under section 14(e) of the Williams Act regarding Brunswick's disposition of Sherwood. *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366, at p. 372 [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,399 at p. 92,397 (6th Cir. 1981). The court further concludes that the lock-up options found by the *Mobil* court to be in violation of section 14(e) of the Williams Act are not present in the case before the court. In *Mobil*, Marathon granted to U. S. Steel a stock option and the Yates Field option in the context of a merger agreement in the face of a hostile takeover by Mobil. The Yates Field option, which is the only *Mobil* option relied upon by Whittaker in this case, could be exercised by U. S. Steel only if U. S. Steel's offer for Marathon did not succeed and if a third party gained control of Marathon. The first distinction between *Mobil* and the present case is obvious—in *Mobil*, Marathon granted a lock-up option to U. S. Steel to be exercised if a third party gained control of Marathon while in the present case Brunswick sold a substantial asset to a third party in the face

of a hostile tender offer. The fact that the Brunswick sale of Sherwood to American Home permits the acquisition to be made by way of tender offer, shares plus cash, or cash does not make the transaction fall within the definition of a lock-up under *Mobil*. Brunswick has not granted any lock-up option to American Home, nor did Whittaker revise its offer for Brunswick in an attempt to compete with the proposed sale of Sherwood as Mobil did in the *Mobil* case. Thus, the sale of Sherwood has not created an artificial price ceiling in the tender offer market for Brunswick common shares which would be a manipulative act in violation of the Williams Act. Indeed, the present American Home offer pays more to Brunswick shareholders at the front end of the deal than does the Whittaker offer. Moreover, the Sherwood sale, while in response to the Whittaker tender offer, cannot be construed as expressly designed solely for the purpose of completely blocking normal, healthy market activity as did the Yates Field lock-up in *Mobil*. A sale of a substantial asset by a corporation in the face of a hostile tender offer standing alone is not a violation of section 14(e).[7] Indeed, the Sherwood sale might actually be characterized as part of healthy market activity, especially in light of the fact that Brunswick would receive more for Sherwood in the sale to American Home than what Sherwood was valued at by Whittaker—even assuming that the Sherwood sale is taxable to Brunswick. Moreover, there is no comparable threat to other bidders as in *Mobil* that, even if they gain control of Brunswick, they will lose Sherwood. Sherwood will be *sold* by Brunswick—not "locked-up" —and any potential bidders will be bidding for Brunswick without Sherwood. Accordingly, the court concludes that the proposed sale of Sherwood by Brunswick is not a manipulative act in violation of section 14(e) of the Williams Act.

20. For the purpose of the federal antitrust laws, distinctive end uses, independent pricing, and customer recognition are the main criteria for defining a product

---

7. Such a sale does not necessarily preclude the   possible violations of certain state laws.

or submarket. *United States v. Alcoa*, 377 U.S. 271, 273–77, 84 S.Ct. 1283, 1285–1288, 12 L.Ed.2d 314 (1964); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). The "realities of competitive practice" must control the proper delineation of a relevant market for antitrust purposes. *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir. 1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978).

21. If the market is defined and limited to the motor-operated aircraft valve market, Brunswick's Circle Seal subsidiary has approximately 10–12% of the market; Whittaker has 20–22%; and ITT has over 60%.

■ 22. Section 16 of the Clayton Act, 15 U.S.C. § 26 (1980) confers a private right of action to restrain a threatened violation of section 7 of the Clayton Act. This private right of action to obtain injunctive relief against an unlawful acquisition extends to the target of a hostile takeover bid. *Grumman v. LTV Corp.*, 665 F.2d 10 [1981–82] Trade Cases (CCH) ¶ 64,364 at 74,683 (2d Cir. 1981); *Mobil Corp. v. Marathon Oil Corp.*, [1981–82] Trade Cases (CCH) ¶ 64,420 (6th Cir. 1981).

23. The relevant market for motor-operated aircraft valves includes all remote-operated valves used in aerospace applications in the United States, whether such valves are produced domestically or abroad. *See, e.g., F. T. C. v. Great Lakes Chemical Corp.*, 528 F.Supp. 84[5] Trade Reg.Rep. (CCH) ¶ 64,175 (N.D.Ill.1981). The market so defined is substantially competitive, with low barriers to entry in the market. *See Kaiser Aluminum & Chemical Corp. v. F.T.C.*, 652 F.2d 1324, 1341 (7th Cir. 1981).

■ 24. Applying the antitrust law to the facts established in the present case, the court concludes that the proposed merger of Brunswick and Whittaker would not be a violation of section 7 of the Clayton Act. Moreover, even assuming *arguendo* that the relevant market is the narrower one of motor-operated aircraft valves, the court concludes that the low level of technological expertise and the limited capital required to enter the market coupled with the fact that approximately thirteen companies compete for such a market make the proposed merger of Brunswick and Whittaker not a violation of section 7 of the Clayton Act.

■ 25. A board of directors enjoys the presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971). A court under such circumstances will not substitute its own notion of what is or is not sound business judgment. *Id.*

■ 26. In the absence of a showing of bad faith on the part of the directors or of a gross abuse of discretion, the business judgment of the directors will not be interfered with by the courts. *Panter v. Marshall Field & Co.*, 646 F.2d 271, 293 (7th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Warshaw v. Calhoun*, 43 Del.Ch. 148, 221 A.2d 487, 492–93 (Del.1966).

■ 27. The business judgment rule may not be invoked by a board of directors unless: (1) management acts in a good faith belief that its decision is in the company's best interests; (2) it exercises due care in ascertaining relevant facts and law before making the decision; and (3) it has no personal interest in the transaction. *Kaplan v. Goldsamt*, 380 A.2d 556, 568 (Del.Ch.1977); *Condec Corp. v. Lunkenheimer Co.*, 43 Del.Ch. 353, 230 A.2d 769, 777 (1967).

■ 28. The burden of showing the existence of bad faith or abuse of discretion on the part of a board of directors rests upon the plaintiff. *Warshaw v. Calhoun*, 43 Del.Ch. 148, 221 A.2d 487, 493 (Del.1966).

■ 29. Under the Delaware business judgment rule, a complaining party must show that the sole or primary motive of the action complained of was to retain control of the corporation. *Johnson v. Trueblood*, 629 F.2d 287, 293 (3d Cir. 1980). Where the complaining party makes a sufficient showing that the sole or primary mo-

tive was to retain control, the burden shifts to the defendant to show that the transaction has a valid business purpose. *Id.*

30. When confronted with a threatened change in control, a board of directors of a target company may engage in a corporate transaction with a third party that the board determines in its business judgment to be in the best interests of shareholders. *See Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 381–84 (2d Cir. 1980); *Crouse-Hinds Co. v. Internorth, Inc.,* 634 F.2d 690, 701–04 (2d Cir. 1980). In so doing, the board of directors may enter into various arrangements with the third party to promote consummation of the transaction even though to do so might cause the hostile tender offeror to withdraw. *Id.*

31. The sale of an asset which has the result of making a company less attractive to a tender offeror can be a proper exercise of a board of directors' business judgment. *See GM Sub Corp. v. Liggett Group, Inc.,* No. 6155, slip op. at 3 (Del.Ch. April 25, 1980); *Crouse-Hinds Co. v. Internorth, Inc.,* 634 F.2d 690, 701–04 (2d Cir. 1980); *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 381–84 (2d Cir. 1980).

32. In *Joseph E. Seagram & Sons, Inc. v. Abrams,* 510 F.Supp. 860 (S.D.N.Y.1981), the court concluded that management cannot have a "scorched earth" policy merely to thwart a hostile tender offer.

33. Reliance upon advice of legal counsel, even if wrong, by a board of directors is not a breach of fiduciary duty. *Tannenbaum v. Zeller,* 399 F.Supp. 945, 955 (S.D.N.Y.1975), *aff'd in part and rev'd on other grounds,* 552 F.2d 402 (2d Cir. 1977), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977).

34. Applying the law regarding a board of directors' breach of fiduciary duty to shareholders to the facts established in this case, the court concludes that Brunswick's board of directors has not breached its fiduciary duty to the Brunswick shareholders. Although the current Brunswick board of directors includes two officers, a former officer, and a partner in the law firm of Mayer, Brown & Platt, the court concludes that the board is independent as well as financially sophisticated. Further, while recognizing the admonition of Judge Cudahy that "the business judgment rule should [not] clothe directors, battling blindly to fend off a threat to their control, with an almost irrebuttable presumption of sound business judgment ...," *Panter v. Marshall Field & Co.,* 646 F.2d 271, 299 (7th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (Cudahy, J., dissenting), Whittaker has not made a sufficient showing that the primary motive of the board of directors was to retain control. Moreover, even assuming *arguendo* that the facts established here shift the burden of persuasion to Brunswick's board of directors, the court finds that Brunswick has established that the proposed transaction with American Home for the sale of Sherwood was within the bounds of valid business purposes.

35. Section 271 of Tit. 8 of the Delaware Corporation Code provides that a corporation must obtain majority shareholder approval of a sale of "all or substantially all of its property and its assets, including its goodwill and its corporate franchises." Tit. 8 of the Del.Corp.Code § 271 (1978).

36. In order to require shareholder approval of a sale of corporate assets under section 271 of Tit. 8 of the Delaware Corporation Code, the sale must be of assets "quantitatively vital to the operation of the corporation" and "strike at the heart of the corporate existence and purpose." *Gimbel v. Signal Companies, Inc.,* 316 A.2d 599, 606 (Del.Ch.), *aff'd on other grounds,* 316 A.2d 619 (Del.1974). The sale of an asset representing at least 26% and possibly as much as 50% of a corporation's total assets is not a sale of substantially all of the corporation's assets for the purpose of section 271 of Tit. 8 of the Delaware Corporation Code. *Id.*

37. Applying the relevant law regarding section 271 of Tit. 8 of the Delaware Corporation Code to the facts established in this

**952**

case, the court concludes that Brunswick has not violated section 271 of Tit. 8 of the Delaware Corporation Code in the proposed sale of Sherwood to American Home.

Accordingly, the court denies Whittaker's motion for a preliminary injunction and denies Brunswick's motion for a preliminary injunction.

It is so ordered.