The BRITISH PRINTING & COMMUNICATION CORPORATION plc, Plaintiff,

v.

HARCOURT BRACE JOVANOVICH, INC., First Boston Corporation, First Boston Securities Corporation, Theodore M. Black, J. William Brandner, Ralph D. Caulo, Trammell Crow, Robert L. Edgell, Paul Gitlin, Marta Casals Istomin, Walter J. Johnson, Peter Jovanovich, William Jovanovich, Eugene J. McCarthy, Peter J. Ryan, Virginia B. Smith, Jack O. Snyder, and Michael B. Winston, Defendants.

No. 87 Civ. 3766 (JFK).

United States District Court, S.D. New York.

July 24, 1987.

Weil, Gotshal & Manges, New York City (Dennis J. Block, Nancy E. Barton, Joseph S. Allerhand, H. Adam Prussin, Eric N. Landau, Myrna S. Levine, Donald E. McKnight, Jr., of counsel), for plaintiff The

British Printing & Communication Corp. plc.

Fried, Frank, Harris, Shriver & Jacobson, New York City (Sheldon Raab, William McGuinness, Terrence A. Corrigan, Debra M. Torres, John A. Borek, Sandra Lipsman, Karen Morris, John Sullivan, Sheila G. Gruber, of counsel), for defendants Harcourt Brace Jovanovich, Inc. and certain individual defendants.

Sullivan & Cromwell, New York City (John L. Warden, Gandolfo v. DiBlasi, Norman Feit, Pressly M. Millen, Daryl A. Libow, of counsel), for defendants The First Boston Corp. and First Boston Securities Corp.

KEENAN, District Judge:

### Introduction

Before the Court is a motion for an order pursuant to Fed.R.Civ.P. 65 enjoining the implementation of a recapitalization planned by a major publicly-owned corporation. Finding that the movant has failed to demonstrate irreparable injury and either a likelihood of success on the merits or a balance of hardships tipping decidedly in favor of the movant, the Court denies the motion. Having heard testimony at a hearing over three days, and on the basis of numerous submissions, the Court makes the following findings of fact and conclusions of law:

### Findings of Fact

Plaintiff British Printing & Communication Corporation plc ("BPCC") is a British corporation with its headquarters in Oxford, England. Its chairman and chief executive officer is Robert Maxwell. BPCC is owned by Pergamon Holding Foundation ("Pergamon"), an entity organized under Lichtensteinian law. The identity of the owners of Pergamon, and thus ultimately of BPCC, is a closely-guarded secret. BPCC is one of the world's largest publishing communications and information companies, earning in 1986 more than 120 million dollars. It holds the majority of the outstanding 6⅜% convertible subordinated debentures of defendant Harcourt Brace Jovanovich, Inc. ("HBJ"), with a principal amount of $9,490,000.

HBJ is a New York corporation with its principal place of business in Orlando, Florida. It pursues three main lines of business: publishing, life and health insurance and theme parks. Publishing, the original field in which HBJ began operations in 1919, remains the core of its business. Within the publishing field, HBJ concentrates on educational publishing, from pre-kindergarten through graduate and professional schools. Transcript ("Tr.") 266–67. The chairman of the board of directors of HBJ is William Jovanovich ("Jovanovich"). He and the fourteen other members of HBJ's board are named individually as defendants herein. HBJ's common stock has been traded publicly since 1960 and is listed on the New York Stock Exchange.

The First Boston Corporation ("First Boston") is an investment banking corporation organized under the laws of Massachusetts and having its principal place of business in New York, New York. First Boston has for several years acted as HBJ's principal financial advisor and has participated in two public securities offerings by that company. Tr. 273–74. First Boston Securities Corporation ("FBSC") is a wholly-owned subsidiary of First Boston. Incorporated under the laws of Delaware, FBSC has been used by First Boston as a vehicle for the extension of financing in major corporate transactions on several prior occasions.

On Monday, May 18, 1987, Jovanovich received at HBJ's offices in Orlando a letter sent via telecopier from Maxwell, proposing a merger of BPCC with HBJ in exchange for payment to HBJ shareholders of $44.00 per share of common stock. The letter, PX 2, stated that Maxwell and the other directors of BPCC were prepared to meet with HBJ "to review all aspects of such a transaction, including price." It further stated that BPCC had reason to believe that financing was available to it for such transaction. The proposed merger would be conditioned on HBJ's cancellation of a public offering then being contemplated. The letter stated that BPCC had no plans to change the headquarters or

replace the management of HBJ were a merger to be consummated.

The Maxwell letter of May 18 had been preceeded minutes before by a telephone call placed by Maxwell to Jovanovich's office. Jovanovich's secretary had informed Maxwell that Jovanovich was not in. Tr. 269. Shortly after the letter was sent, BPCC issued a release to the press, advising that it had made the proposal to HBJ and including a copy of the Maxwell letter. DX F.

Several hours later, Jovanovich issued a press release in response to the proposal, describing it as "preposterous as to intent and value." Jovanovich Deposition ("Dep.") 76–77. Jovanovich based this opinion on his own estimate of the value of HBJ, the manner in which the proposal was made (and publicized) and his opinion of Maxwell as a businessman. Jovanovich Dep. 67–73. HBJ contacted its senior management personnel, its outside directors and representatives of First Boston. A meeting of the board of directors was scheduled for May 21, 1987. Jovanovich requested that First Boston advise the board with respect to the Maxwell proposal and the alternatives it might consider. Tr. 112–14. First Boston had previously studied HBJ and the publishing business in general for several years in its investment banking capacity and was, in its own view, very familiar with the value of the company. Tr. 445. In connection with the planned public offering by HBJ, First Boston had reviewed financial reports and earning projections for the forthcoming years. Tr. 274.

Among those contacted in connection with the Maxwell proposal was J. William Brandner ("Brandner"), a director of HBJ who serves as executive vice-president of the company and as chairman of HBJ Insurance. Tr. 265. Brandner is also a member of the "office of the president" of HBJ, a senior management group. Brandner, a certified public accountant who had been chief financial officer of HBJ, believed that the Maxwell proposal was inadequate as to price, based in part on his experience in potential acquisition by HBJ of several other publishing houses and in the actual acquisition by HBJ of CBS Publishing. Tr. 269. He also doubted the sincerity of the offer because it was immediately made public, rather than becoming the subject of private negotiation. Id.

Brandner was then in California, participating in a public presentation to potential investors in HBJ's planned securities offering. Id. 270. Jovanovich asked Brandner to return to Orlando, which he did. There, he met with Jovanovich and others to discuss the proposal. It was decided that Brandner would be primarily responsible for the negotiations with First Boston concerning its role in responding to the proposal and its informational needs. Id. at 271. Brandner was also charged with presenting to the other members of management the relevant information and options raised by the proposal. He and others met with representatives of First Boston on the following day, Tuesday the 19th of May, in Orlando in order to inform First Boston of the situation and provide it with the necessary information.

Brandner and John Berardi, the senior vice president and treasurer of HBJ, met on Wednesday, May 20, with representatives of Morgan Guaranty Trust in New York, New York to seek financing for possible transactions in response to the Maxwell proposal. Morgan had served as HBJ's primary bank for several decades. Over Wednesday and Thursday, May 21, Brandner and Berardi spent at least seven hours with representatives of Morgan in attempt to secure a line of credit. HBJ had not, however, made any commitments to Morgan at that time. Tr. 274–78.

On Thursday morning, prior to that day's meeting between the HBJ representatives and those of Morgan, First Boston first suggested to Brandner and Berardi the possible implementation of a "public leveraged buyout," whereby shareholders would receive a large cash dividend and still retain ownership in HBJ, which would then be a highly-leveraged company. Id. at 278–79. This suggested alternative was passed on to Jovanovich and other mem-

bers of management by telephone that day. *Id.* at 279.

Since Tuesday afternoon, May 19, First Boston had been working in Orlando to arrive at an opinion as to the adequacy of the Maxwell proposal. A formal agreement retaining First Boston ("the engagement letter") was signed by Ralph Caulo, a member of the board, on behalf of HBJ on Thursday, May 21. *Id.* at 282. The engagement letter provided that First Boston would undertake "a comprehensive study and analysis of the business, operations, financial conditions and prospects" of HBJ. DX G. This analysis was to be based entirely on information available to the public or provided by HBJ to First Boston, rather than upon an independent appraisal of HBJ. *Id.* First Boston also agreed to render an opinion with respect to the adequacy of the Maxwell proposal ("the adequacy opinion") and to render, if requested, an opinion regarding the fairness to HBJ and its shareholders of whatever consideration might be paid to them in the event that an alternative to the Maxwell proposal were to be implemented. *Id.*

In exchange for receiving the foregoing services, HBJ agreed to pay First Boston $500,000 immediately plus an additional $500,000 upon the rendering to the board of HBJ of the adequacy opinion. PX 7. If HBJ were to undertake some form of recapitalization, First Boston would receive under the terms of the engagement letter $7.5 million. If half of HBJ's stock or all of its assets were to be acquired, First Boston would be paid a fee equal to 0.4% of the consideration paid in the transaction by which the acquisition was made. In the event that neither a recapitalization nor a change of control were to occur at HBJ, First Boston would receive under the engagement letter a $1 million independence fee. Under these terms, First Boston would receive $9 million if the adequacy opinion were rendered and if HBJ were acquired by BPCC at the $44 per share price, but would receive only $8.5 million if it rendered the adequacy opinion and if HBJ did recapitalize itself.

At 8:00 p.m. on Thursday, May 21, the Board assembled to consider the Maxwell proposal and HBJ's possible responses. Present were all of HBJ's directors but for Trammell Crow, who was then in the Orient. Of the directors present, six are officers of HBJ: Jovanovich, Brandner, Ralph D. Caulo, Robert L. Edgell, Peter Jovanovich (the son of William Jovanovich) and Jack O. Snyder. Five other directors have business relationships with the company of varying significance: Marta Casals Istomin, Walter Johnson and former Senator Eugene J. McCarthy each receive consulting fees in exchange for rendering services to HBJ; Paul Gitlin performs pre-publication review of manuscripts to be published by the tradebook division (to protect against libel suits); and Peter J. Ryan was formerly a partner in the law firm of Fried, Frank, Harris, Shriver and Jacobson, HBJ's outside counsel. The largest payment to a non-management director of HBJ (other than Trammell Crow) was $75,000, received by Walter Johnson in return for his services as an editorial and marketing consultant for Johnson Reprint Corporation, a subsidiary of HBJ. PX 38. The economic significance to Johnson of this payment is probably negligible in comparison to the value of his holdings of HBJ stock, approximately $90 million. Lesser amounts were paid to the other directors who receive consulting fees. These amounts are generally of the same order of magnitude as those received for being a director of HBJ. Tr. 401–05. The remaining directors present, Theodore M. Black, Virginia B. Smith, and Dr. Michael B. Winston, have no business relationship with HBJ apart from their directorships.

In addition to the directors, several others were present at the 8:00 p.m. meeting on Thursday: Berardi, Charles Harris of the law firm of Smith MacKinnon, Mathews & Harris (a firm that has represented HBJ in corporate matters); Bruce Starling, a senior vice president of HBJ, and two secretaries, a Miss McQuillan and a Mrs. de Carlo. Tr. 284–85.

The initial discussion took place over dinner and concerned the general background of events beginning with the Maxwell pro-

posal. Copies of the Maxwell letter were given to the directors as well as other materials. The circumstances of the proposal were discussed, including Maxwell's immediate release of his letter to the press. The directors considered the advisability of holding the shareholders' meeting scheduled the following day and having received advice of counsel, resolved that it be cancelled. Tr. 285–86.

At this time, representatives of First Boston were invited into the meeting, in order to make a presentation concerning the adequacy of the Maxwell proposal. First Boston presented a slide show consisting of various charts reflecting the results of different valuation analyses they had performed. The slide show was accompanied by the distribution of hard copy of the charts to the directors. Tr. 286–87. First Boston employed three primary methodologies in arriving at a valuation of HBJ, which would then reveal whether the Maxwell proposal was adequate. These consisted of a comparable acquisition analysis for the various segments of HBJ, a comparable company analysis and a discounted cash flow analysis. Tr. 287–88, 439. Each analysis assumed that the business segments of HBJ would continue as going concerns. Tr. 439.

In its comparable acquisition analysis, First Boston examined the amounts paid in recent years for the acquisitions of companies comparable to the various segments of HBJ. Tr. 441. The comparable company analysis performed by First Boston consisted of a comparison of the aggregate market value of companies in the lines of business of the HBJ segments, analyzed in relation to the net earnings of the company. As part of this analysis, First Boston also studied the relationship of revenues and of operating income to the total market value of those companies considered comparable to HBJ segments. Tr. 440–41. First Boston's discounted cash flow analysis was based on projections of the future cash flow of the business segments for the next ten years discounted to present value. Tr. 440; DX QQ. In its projections of future operating income, First Boston used more conservative estimates than did HBJ

in making its own projections. The First Boston figures ranged from 3 percent to 50 percent lower than HBJ's projections. Tr. 447–49. These projections were arrived at in part from a "normalization" of present financial data, a process by which gains or losses attributable to discreet events not likely to recur are factored out of the projections. On such event, for example, was HBJ's acquisition of CBS Publishing. Tr. 449–51.

In arriving at the valuations of individual segments of HBJ, First Boston took into account the taxes normally expected to be incurred by those segments. This primarily meant income taxes. The taxes accounted for did not, however, include any capital gains tax to which the sale of the segments would be subject. This was a reflection of the fundamental assumption that the segments were to be valued as going concerns of which the value to HBJ would be realized through income rather than through a sale of the segments. Tr. 452; Jovanovich Dep. 259. First Boston did perform a "break-up valuation" in order to predict what price an acquirer might be willing to pay for the stock of HBJ in order to then sell off HBJ's assets. This method of valuation was employed in assessing the adequacy of the Maxwell proposal and did take into account capital gains taxes on the hypothetical sale of the assets of HBJ upon acquisition. The break-up valuation was not used in First Boston's subsequent valuation opinion used by the board to determine HBJ's surplus. Tr. 453–54.

By aggregating the valuation figures for each segment of HBJ and comparing the results of the three methodologies employed, First Boston arrived at a range of figures that it believed best reflected the value of HBJ. Comparing this range of values to the total represented by the Maxwell proposal, First Boston concluded that the Maxwell proposal was inadequate, and so advised the board of HBJ. Tr. 287, 298; Winston Dep. 78–79. The board did not, however, decide then to reject the Maxwell proposal. Tr. 305.

At this point, representatives of First Boston outlined for the directors the recapi-

talization that it had previously suggested to management. Tr. 298; PX 10; Jovanovich Dep. 127. The basic elements described were a payment of a special dividend to the shareholders of HBJ consisting of cash and additional securities, increased ownership of HBJ stock by the employee stock ownership plan ("ESOP") and financing for these transactions from First Boston and Morgan. Tr. 298; PX 10. This recapitalization would allow HBJ to give its shareholders immediate value while allowing them to retain the benefit of potential growth of the company. Smith Dep. 34. With the understanding that a more definite recapitalization proposal would be developed over the coming weekend, the board adjourned until the next morning, Friday, May 22, 1987. PX 10.

Friday morning's meeting was short. It had been scheduled to coincide with the now-cancelled public offering and, before addressing the Maxwell proposal and the possible alternatives, the board dealt with more routine matters concerning, among other things, the retirement of officers and bank resolutions. Tr. 307. The board then reviewed the discussions of the previous meeting and reached a consensus that the Maxwell proposal was inadequate with respect to price and of too little seriousness to merit further consideration. Smith Dep. 38–39. First Boston's adequacy opinion, PX 9, had not yet been formally distributed to the board. PX 10.

Alvin Shoemaker, the chairman of First Boston was next invited to address the board. Tr. 115, 307, PX 10. Shoemaker expressed concern that Maxwell might attempt a "street sweep" immediately after the up-coming Memorial Day weekend. Tr. 116. In a street sweep, a potential acquirer abandons his attempt to acquire a company by bidding and instead purchases as many shares as possible on the open market, particularly from arbitrageurs. Tr. 117, 307–08. This possibility created a need for expedition in responding to the Maxwell proposal, as those who were not confident of the long-term value of HBJ's stock might be convinced to sell their shares for a less than adequate price. Tr. 117. Thus, it would be necessary to assure the shareholders that they would receive greater value than that offered by Maxwell, through a swift response by the board. *Id.;* Jovanovich Dep. 239–40. Shoemaker discussed with the directors their responsibilities to shareholders in such a situation, answering questions by former Senator McCarthy, Virginia Smith, and other directors. Questions came from both those holding management positions at HBJ and those who did not. Tr. 118–120. Finally, Shoemaker discussed the recapitalization plan briefly. Tr. 309. The board then adjourned until Monday evening, May 25. Over the weekend, members of HBJ's management worked with representatives of First Boston, Morgan and legal advisers to prepare a detailed recapitalization plan and make the necessary financial arrangements. Tr. 310–12.

On Monday the 25th, Memorial Day, the board met at approximately 8:00 p.m. PX 10. It was at this meeting that the details of the proposed recapitalization plan were presented to the board. Tr. 313; Jovanovich Dep. 253–54; PX 10.

The plan called for a distribution of a special dividend to holders of HBJ common stock, consisting of $40 in cash and a single share of preferred stock to be valued at approximately $10. Shareholders would retain their existing shares. Tr. 122, 312, 314. These shares would be referred to as "stub" shares, and their value would be diminished because of the cost of making the special dividend. Tr. 122. The total paid to the shareholders would then be somewhere in the range of $55 to $57, as a result of the recapitalization. Tr. 125, 312. The retention of the stub shares would allow shareholders to participate in the future economic growth of HBJ after the implementation of the recapitalization plan.

A second part of the plan, as described to the directors at the Memorial Day board meeting, was to be the contribution of a new issue of convertible preferred stock to the pre-existing ESOP, PX 10; Jovanovich Dep. 229–30, and an offer to the ESOP of HBJ common shares repurchased on the open market. PX 10; Tr. 320, 322–23. This would provide an incentive for employ-

ees to work more productively, which would be essential to the ultimate success of the recapitalization plan. Tr. 126; Jovanovich Dep. 229–31; Smith Dep. 105. This was particularly important because the cost of the special dividend would require HBJ to restrict its spending in the near future, thus impinging on its ability to offer other financial incentives to its employees. Tr. 126. The trustees of the ESOP, who were members of HBJ's management, had obtained independent legal and financial advisers to scrutinize the role of the ESOP in this aspect of the recapitalization plan. Those advisers had worked throughout the previous weekend in order to be able to carry out that task. Tr. 311. The ESOP plan contained a "pass-through" provision under which shares allocated to individual participants' accounts would be voted by the participants. The trustees of the ESOP have agreed with the New York Stock Exchange that they will vote the unallocated shares for and against proposals to shareholders in the same proportion as the allocated shares are voted. Tr. 352, 371–72.

These elements of the recapitalization plan were presented to the directors in an oral presentation accompanied by a slide show and hard copy of the materials shown in the slide show. Tr. 313; DX M.

The discussion next focused on the financing arrangements that would allow HBJ to accomplish this recapitalization. Temporary, or "bridge," financing was to be provided by First Boston (through FBSC), which was prepared to commit $985 million in order to provide immediate cash for share purchases and for the payment of the special dividend. As a condition of making this commitment, First Boston required that it be allowed to purchase sufficient shares of HBJ stock to give it some voice in the running of the company. Tr. 147–50. Accordingly, the plan provided for HBJ to sell to First Boston 40,000 shares of a new issue of Exchangeable Redeemable Preferred Stock ("ERPS"), at a total price in excess of $80 million. Tr. 316; DX M. These shares would carry a total of 8,160,000 votes, representing a cost of approximately $10 per vote, an amount equivalent to the expected price at which HBJ's shares would be trading "ex dividend," i.e., without the right to receive the special dividend because purchased after the record date for payment of the dividend. There are no agreements or tacit understandings between HBJ and First Boston concerning how First Boston will exercise its votes from these shares. Jovanovich Dep. 211–12; Tr. 146, 321–22. It was expected that First Boston would vote its shares as would any other investor. In fact, part of the reason First Boston wanted a share of the equity of HBJ was to allow it to benefit from the future economic growth of HBJ, as would other shareholders. Tr. 147.

This bridge financing by First Boston is expected to be retired through the sale of high-risk, high-yield, subordinated securities, known as "junk bonds." PX 10; Winston Dep. 139; Tr. 374–75. In addition, permanent financing is to be provided by Morgan, as the leader of a lending syndicate which would lend $1.9 billion to HBJ. Tr. 325–26; PX 10. The bank loan must, under the terms of the loan agreement, be used to retire existing debt, so that the Morgan syndicate and First Boston will be the only remaining creditors of HBJ. *Id.* Despite the size of the bank loan, the bridge financing is necessary because the retirement of existing debt and the allocation of working capital out of the bank loan leaves too little available for the payment of the special dividend. Tr. 326.

Following the description of the recapitalization plan in detail and questions addressed to that by board members, discussion turned to the likely effects of the transaction on the future of HBJ. Management described to the rest of the directors the restrictions on spending and cost reductions that would be required in order to meet interest payments. The directors each were presented with documents depicting the cash flow requirements necessary to make those payments and detailing the anticipated source and application of those funds. Tr. 328–29; PX 10; Winston Dep. 154–55. The directors discussed the possible sale of certain assets (primarily undeveloped land), the reduction

of HBJ's work force through attrition, and the forgoing of planned new projects. PX 10. These steps were compared to the likely results of an acquisition of HBJ by BPCC, which was expected to result in the merger of HBJ's overseas operations with those of BPCC and a concomitant loss of one-half to two-thirds of employees' jobs, the withdrawal of HBJ from the trade publishing business, and the sale of its elementary and secondary school publishing business and of its magazine publishing division. PX 10; Jovanovich Dep. 272–78; Tr. 330. At the conclusion of this discussion, the board adjourned its meeting until the following morning, Tuesday, May 26. PX 10.

On Tuesday morning, the board reviewed the discussions of the previous night, including the cash flow projections and the cost-reduction measures required by the proposed recapitalization. PX 10; Smith Dep. 135–37; Tr. 327–30. The directors questioned the officers of HBJ extensively on their ability to meet the requirements of the recapitalization plan. Tr. 330; Winston Dep. 160–61; PX 10. Representatives of First Boston and Morgan again reviewed with the directors the terms of the financing, referring them to documents earlier provided to each director. PX 10; Tr. 328. It was pointed out that First Boston required the right to purchase the new issue of HBJ stock as a condition of its loan to HBJ and that the loan agreement contained default provisions and allowed First Boston to call in the loan if a change in control were to occur at HBJ. PX 10; Tr. 328; Winston Dep. 134; Smith Dep. 82. This latter provision was required by First Boston to ensure that it would not be faced with a lengthy commitment to new management which might not be as reliable in running HBJ as First Boston believed HBJ's present management to be. Tr. 145–46.

The next item reviewed by the board was the costs of the proposed recapitalization, which were agreed to be high, but comparable to the costs of similar transactions performed by other companies in the past. PX 10; Tr. 330–31. Among these fees were those to be paid to First Boston in connection with its extension of the bridge loan and its possible underwriting of the junk bond issue. First Boston would receive a $29 million fee for extending the bridge financing and a 3½ percent underwriting discount upon the issuance of the junk bonds. Tr. 154. The latter fee should amount to approximately $35 million, which amount must be paid to First Boston even if the bonds are not issued. Tr. 159; PX 49. The total transactional costs of the recapitalization, including Morgan's fee of $46 million for arranging the $1.9 billion loan, would amount, it was explained to the board, to approximately $125–130 Million. PX 10; PX 49.

Following additional review of the proposed recapitalization plan, the meeting was adjourned until 3:00 p.m. that afternoon, May 26, 1987.

When the board resumed its meeting that afternoon, the non-management directors decided to meet separately to discuss the issued raised in the previous meetings, apparently at the suggestion of Shoemaker and Jovanovich. Tr. 128, 335; Winston Dep. 161–64; PX 10. Dr. Winston led the meeting, during which the non-management directors formulated additional questions that they wished to ask management and others. Smith Dep. 120–22; Winston Dep. 166. They then questioned separately Harris, certain members of management and representatives of First Boston. Winston Dep. 169–71. Having received answers to their questions, the non-management directors then concluded their separate meeting and invited in the remainder of the board. The separate meeting had lasted between 20 and 90 minutes. PX 10; Tr. 335, 408; Smith Dep. 120; Winston Dep. 164. Its probable true length was 45 minutes to an hour.

When the management directors returned, the board reviewed a press release describing the proposed recapitalization and revised it at the suggestion of Virginia Smith. PX 10. The directors then considered an opinion letter furnished by First Boston on its valuation of HBJ. DX J. That letter expressed a valuation of HBJ at the low end of the range calculated by

First Boston, which was nevertheless sufficiently high to support the payment of the special dividend. As well as the First Boston valuation letter, the directors received and reviewed copies of a letter from Arthur Anderson & Co. (the accounting firm) regarding the liabilities of the company, DX O; a memorandum from Berardi concluding that the recapitalization plan would not render HBJ unable to pay its debts and other obligations as they became due, DX P; a memorandum from the officers of HBJ certifying that the financial projections employed by First Boston and others in designing the recapitalization had been reasonably prepared on the basis of the best available information, DX Q; and two letters from Richard Udell (the administrative vice president and general counsel to HBJ) concerning the likelihood of HBJ's incurring liability as the result of various litigation pending or expected to be brought against HBJ; DX R. The directors reviewed each of these documents and discussed them among themselves and with officers of the company and counsel. Tr. 337. Jovanovich indicated that he had spoken to Trammell Crow about the proposed recapitalization and that Crow had expressed his support for it. PX 10.

The board of directors, having concluded its review of the proposed recapitalization and the supporting documents, thereupon voted unanimously to reject the Maxwell proposal and to approve the recapitalization. A press release announcing their decision was approved and disseminated. Tr. 337–39.

This litigation ensued.

### Conclusions of Law

To obtain a preliminary injunction, the moving party must demonstrate that it will suffer irreparable harm absent the granting of such relief and either a likelihood of success on the merits, or sufficiently serious questions going to the merits of the litigation and a balance of hardships tipping decidedly in favor of equitable relief. *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 260 (2d Cir.1984); *see Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 272–73 (2d Cir.1986) ("Han-

son II"). The preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies [and] must be used with great care, lest the forces of the free market, which in the end should determine the merits of takeover disputes, [be] nullified." *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir.1985) ("Hanson I"). The Court will consider these factors in turn.

### Irreparable Harm

■ BPCC contends that it will be irreparably harmed absent some form of preliminary relief because the implementation of the recapitalization plan by HBJ will prevent any future takeover of HBJ. This, BPCC contends, effectively deprives shareholders of the opportunity to obtain the maximum possible value for their investment, which they might otherwise obtain in a contest for control of HBJ. BPCC premises this contention on the sale of the preferred stock to First Boston, the contribution and sale of stock to the ESOP and the provision in HBJ's loan agreements with First Boston and Morgan which allow for the debt to be called in immediately upon a change of control at HBJ.

These transactions do not, however, foreclose a successful bid for control of HBJ. While First Boston may be favorably disposed to the present management of HBJ, there is no agreement or implied understanding which would compel First Boston to favor them if an attractive offer were made for First Boston's stock or to vote against a proposed merger with BPCC or any other entity. This is also true of the ESOP. BPCC has offered nothing but speculation to support its contention that the ESOP trustees would vote as a block with management or First Boston on future transactions. The "pass-through" provision of the ESOP ensures that all allocated shares held by the ESOP will be voted by HBJ's employees, not by management. The trustees have agreed with the New York Stock Exchange that they will vote those shares not yet allocated for and against any proposal to the shareholders in the same proportion as the allocated shares are voted. Thus, the contribution and sale

of stock to the ESOP does not "lock up" voting control over those shares with the management of HBJ. Even if that were the case, moreover, the trustees would be bound by law to act in the best interests of the ESOP beneficiaries and to tender its shares if that were in the beneficiaries' best interests. *See* 29 U.S.C. § 1104; *Donovan v. Bierwirth,* 680 F.2d 263 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

Nor do the change of control provisions in HBJ's loan agreements preclude a takeover of the company. The would-be acquirer need only obtain sufficient financing of its own with which to replace the loans in order to render those provisions nugatory. Even absent such alternative financing, the acquirer would quite possibly be able to assure First Boston and Morgan that it is capable of running HBJ as efficiently as does present management and thereby dissuade them from calling in the loans.

In sum, none of these aspects of the recapitalization plan prohibit an acquisition of HBJ by an entity with sufficient capital and determination. That they might discourage less well-equipped suitors, while providing immediate value to HBJ's shareholders, does not constitute the sort of irreparable harm that the Court ought to protect through injunctive relief. To do so would interfere with the forces of the free market on which shareholders depend to increase their investment.

Nor does the payment of the special dividend itself create irreparable harm to BPCC as a shareholder. The debt incurred in order to provide that dividend will be offset by the payment of the dividend (plus cost-reductions implemented because of the recapitalization). The net result of the recapitalization is therefore to neither decrease nor increase the value of HBJ to its shareholders but to allow them to realize that value, in part immediately, more fully than they might otherwise.

The true risk of harm arising from the declaration of the special dividend is to the creditors of HBJ, who might be left without adequate recourse should HBJ fail to meet its financial obligations. The only

significant creditors remaining after the recapitalization, however, will be First Boston and the Morgan syndicate. Because they favor the recapitalization, the Court need not enjoin it to protect their interests. BPCC surely should not be heard to argue that it understands the true interests of creditors better than do the creditors themselves.

Finally, the possibility that HBJ stock will be delisted from the New York Stock Exchange because of the Exchange's networth rules is speculative and insufficient to warrant the granting of relief. In contrast, the threat of delisting in *Norlin v. Rooney, Pace Inc.,* 744 F.2d at 260, was much more concrete—the Exchange had already expressed its intent to delist the stock there. No such event has occurred in this case.

### Likelihood of Success on the Merits

As stated above, BPCC must show that it is likely to succeed on the merits in order to satisfy the first alternative ground for granting injunctive relief, assuming the Court were to agree that it had demonstrated irreparable harm. The Court concludes that BPCC has failed to make that showing.

The parties agree that the propriety of the action taken by HBJ's directors must be determined according to the law of New York, the state in which HBJ is incorporated. New York law imposes two principal duties on corporate directors: a duty of due care in the execution of directoral responsibilities and a duty of loyalty to the best interests of the corporation and its shareholders. *Hanson II,* 781 F.2d at 273–74; *Norlin v. Rooney, Pace Inc.,* 744 F.2d at 264. *Cf.* Plato, *The Republic* Part Four [Book Three] at 180 (Penguin Classics 2d ed. 1974) ("... we must look for the Guardians who will stick most firmly to the principle that they must always do what they think best for the community."). In assessing the conduct of directors under New York law, the Court is barred by the "business judgment rule" from second-guessing actions taken by the directors "in good faith and in the exercise of honest judg-

ment in the lawful and legitimate further-ance of corporate purposes." *Auerbach v. Bennett,* 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 926, 393 N.E.2d 994, 1000 (1979). This business judgment rule applies in the contexts of bids for corporate control as in other contexts and "affords directors wide latitude in devising strategies to resist unfriendly advances." *Norlin v. Rooney, Pace Inc.,* 744 F.2d at 264; *see Hanson II,* 781 F.2d at 273. The latitude afforded directors in such circumstances is not, of course, unlimited. *Hanson II,* 781 F.2d at 273.

■ The initial burden of proving that corporate directors have breached a fiduciary duty rests with the plaintiff. *Id.; Crouse-Hinds Co. v. Internorth, Inc.,* 634 F.2d 690, 701–04 (2d Cir.1980). Where a plaintiff is able to make a prima facie showing of self-interest on the part of the directors, the burden shifts to the directors to demonstrate that the transaction is fair and in the best interests of the corporation and its shareholders. *Norlin v. Rooney, Pace Inc.,* 744 F.2d at 264. The interest of directors in retaining their positions as directors is not by itself sufficient to cause the burden to shift to them. *Crouse-Hinds Co. v. Internorth, Inc.,* 634 F.2d at 702. BPCC argues that the consulting relationships between certain non-management directors and HBJ renders them self-interested. These relationships are not of substantial economic significance, however, and do not result in payment to the directors involved substantially in excess of normal directors' fees. Because the receipt of directors' fees is not sufficient to show self-interest by a board member, *see, e.g., In re E.F. Hutton Banking Practices Litigation,* 634 F.Supp. 265, 271 (S.D.N.Y.1986), the Court does not believe that the directors were truly self-interested in the recapitalization. (Nor do Walter Johnson's substantial stock holdings in HBJ provide him with any interest conflicting with those of other shareholders.) Nevertheless, the Court concludes that the better course is to apply the more stringent rule and examine the transaction as if the directors were self-interested, because of the importance of the recapitalization to HBJ and its share-

holders and because of the preliminary nature of the fact finding process on this application for injunctive relief. Accordingly, the Court concludes that the burden of demonstrating the fairness of the transaction to the corporation and its shareholders must rest with the directors.

■ The Court believes that no lengthy analysis is necessary before concluding that the directors satisfied their duty of due care in examining the Maxwell proposal and in responding to it. The primary requirement of the duty of due care is that the directors make an informed decision, having availed themselves of the advice of experts and using the available time to consider their options carefully. *See Hanson II,* 781 F.2d at 274–77.

The directors met five separate times over six days to consider the Maxwell proposal and the alternatives available to them. They consulted financial advisers who had been familiar with HBJ from past association and who engaged in a near-Herculean effort to provide the board with advice soundly based on thorough analysis and to structure the alternative transaction that appeared best to all concerned. The board did not rely on conclusory statements of their advisers, but reviewed carefully and questioned the support for the advice they received. Those advisers had been provided with the best information then available to HBJ in order to perform their tasks. The directors appropriately considered the effects of the recapitalization on HBJ and its shareholders and the effects of a failure to act swiftly. They availed themselves of the time they reasonably believed they had in which to act. In sum, it is difficult to see how the directors could have been more diligent or better informed under the circumstances.

That the board declined to approach BPCC for negotiations does not indicate that the directors did not fully investigate the relevant facts. It was reasonable to conclude from the terms of the Maxwell proposal and the manner in which it was made and publicized that BPCC did not intend to negotiate in good faith towards a purchase of HBJ at a fair price.

That management played an important role in providing information to the board's advisers and in working with them to plan the recapitalization was proper and detracts in no way from the conclusion that the directors exercised due care. Management was to receive no greater benefits from the recapitalization than would HBJ's employees and shareholders. Moreover, it possessed the information and expertise vital to the development of an effective response to the Maxwell proposal.

Concluding then that the directors of HBJ did not breach their duty of due care, the Court must address the question of their loyalty to HBJ and its shareholders, of the fairness of the recapitalization.

■ BPCC does not contend that the shareholders received no value from the recapitalization, arguing instead that they received less than otherwise might be available because the board acted to entrench the incumbent management rather than to further the interests of the shareholders. The evidence adduced by BPCC is insufficient to support this conclusion.

BPCC urges that the sale of exchangeable redeemable preferred stock to First Boston was designed solely to place votes in friendly hands in order to entrench management. The record reveals, however, that it was First Boston that insisted on the right to purchase the stock as a condition of providing the bridge financing, as a way of ensuring that it had a voice in HBJ's management (so as to protect its loan to HBJ) and as an investment. BPCC adduced no evidence of a secret or open agreement between First Boston and any other entity concerning how it would vote or dispose of its shares. In addition, First Boston paid a price for that stock equivalent to the market price for the comparable common stock being traded on the market ex dividend.

Similarly, BPCC's reliance on the stock transactions involving the HBJ ESOP is of no avail to it. The evidence was uncontradicted in showing that the ESOP was created for a valid purpose long before the Maxwell proposal. The sale and contribution of HBJ stock to the ESOP as part of the recapitalization plan was intended to serve as an incentive for increased employee productivity, an essential element of the plan's success. No credible evidence to the contrary was adduced. The possibility of an entrenchment motive underlying this transaction is belied by the fact that neither management as a whole nor the ESOP trustees control how the stock held by the ESOP is voted. Whether to tender the stock to a potential acquirer of HBJ would be decided by the trustees under the constraints of their legal obligation to act in the best interests of the ESOP beneficiaries.

The Court concludes that BPCC has failed to demonstrate that the recapitalization plan of HBJ is unfair to HBJ or its shareholders or that it was improperly motivated by a desire to entrench the present management of HBJ.

■ BPCC's final argument against the recapitalization is that HBJ does not have adequate surplus as defined under New York law to allow it to declare and pay the special dividend. BPCC's attack on this aspect of the recapitalization is two-pronged. New York law permits the declaration or payment of dividends out of surplus only. N.Y.Bus.Corp.Law § 510(b). BPCC urges that the surplus must be based on the valuation assets reflected on the books of the corporation. No direct support is cited for that proposition. The leading case on revaluing assets for the determination of surplus makes no mention of the requirement. *Randall v. Bailey*, 23 N.Y.S.2d 173 (Sup.Ct.1940), *aff'd*, 262 App. Div. 844, 29 N.Y.S.2d 512 (Sup.Ct.1941), *aff'd*, 288 N.Y. 280, 43 N.E. 43 (1942). It thus appears that New York law imposes no such requirement and that BPCC's attack on this ground must fail.

■ The second prong of BPCC's argument is addressed to the amount at which HBJ's assets were valued by the board. BPCC contends that the assets were valued too aggressively and that future earnings were wrongly considered in arriving at the valuation. *Randall v. Bailey* supports the use of the "going concern" value of a business in determining surplus under New York law. 23 N.Y.S.2d at 177–78; *see also Hayman v. Morris*, 36 N.Y.S.2d 756, 767–

68 (Sup.Ct.N.Y.Co.1942); *Morris v. Standard Gas & Electric Co.*, 63 A.2d 577 (Del. Ch. 1949) (Delaware law). In addition, the evidence adduced at the hearing revealed that the directors had reasonably relied on expert advice offered by First Boston and that First Boston had been conservative in its valuation of HBJ, reducing the financial forecasts supplied by HBJ's management and adhering to the lower end of the calculated range of values. BPCC has not shown that that valuation was unreasonably high.

Thus, the Court concludes that BPCC has not demonstrated a likelihood of success on the merits.

### Balance of Hardships

The balance of hardships tips decidedly in favor of denying the preliminary relief requested. As stated above, BPCC and the other shareholders of HBJ will suffer no significant injury under the recapitalization plan. Were the Court to enjoin its implementation, however, HBJ would incur substantial interest charges without receiving the attendant benefits of recapitalization. First Boston would be unable to exercise its voice in the affairs of HBJ as required to protect its investment. Most important, to grant the injunctive relief requested would deprive HBJ's shareholders of the value to which they are entitled under the plan. Because of the intricacies of financing, the opportunity to receive this dividend, once delayed, may be lost permanently. Moreover, the expectations of the marketplace upon which investors have bought and sold HBJ stock would be defeated. To do so on the basis of the evidence adduced on this motion would be unfair to all those investors who have acted upon their expectations.

### Conclusion

For the foregoing reasons, the motion for a preliminary injunction is denied.

SO ORDERED.